## The Philadelphia Ball Club, Limited, *v.* The City of Philadelphia, Appellant.

[Marked to be reported.]

*Road law—Change of grade—Leasehold—Future income—Damages.*

In a proceeding by a baseball club against a city to recover damages for an alleged diminution in the value of the leasehold of its ball grounds resulting from a change of grade of a street, where there is no proof that the change of grade affected the income of the club, and the uncontradicted testimony is that the income increased during the progress of the improvement, and continued to increase until the time of the trial, a period of three years, the jury should be instructed that the evidence is insufficient to justify them in allowing any damages whatever for alleged loss of income, whether in the three years which had already elapsed or in the remaining years of the lease.

Argued Jan. 15, 1897.   Appeal, No. 533, Jan. Term, 1896, by defendant, from judgment of C. P. No. 4, Phila. County, June T., 1893, No. 1190, on verdict for plaintiff.   Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ.   Reversed.

Appeal from report of viewers.   Before WILLSON, J.

The facts appear by the opinion of the Supreme Court, and by the charge of the court below which was as follows:

[We now come to another subject entirely, the alleged loss of income.   Upon that subject, in a general way, I desire to say to you that it is undoubtedly the law that a person who is in

the position that the plaintiff here is cannot recover for esti-
mated loss of profits. You heard the question raised here. I
was asked to exclude this evidence, because it was simply a
claim for profits. I declined, in your hearing, to exclude the
evidence, not doubting at all the point made by counsel, that it
is not in accordance with the law that recovery can be had for
profits, but because, in the way in which this case has been pre-
sented to you, the claim is really not for profits, but for a loss
of income. It is undoubtedly true in this case that the claim
for loss of income is a claim which is based upon what are re-
garded as probabilities—probabilities which it is said arise in
view of experience. If there are no probabilities at the basis of
the plaintiff's claim for loss of income, there is nothing in the
claim. If there are no such probabilities at the basis of the
claims as raise in the minds of the jury a conviction that, for
the twelve years or so that the lease may run, there would be
actually, with what you may call business certainty, a loss of
so much as is claimed, or some other sum, upon the same lines,
then that is an end of it, because it is too uncertain in that case
to be entitled to consideration by the jury. The jury cannot
guess at a thing of that sort. It would be very unfair between
the parties that it should. It is only in case the jury is satis-
fied, as a matter of candid business belief and opinion, that
what the city did must reduce the income of the plaintiff to the
extent claimed by the plaintiff, or to some other extent, that
they could give anything whatever to the plaintiff upon the
score of the loss of income. To individualize a little more, I
may say that the first loss of income which the plaintiff claims
is for carriage tolls, $2,700, and is $225 a year for twelve years.
Do you think or not that that is a reasonable claim. You will
see that that portion of the plaintiff's claim is a very large one;
it amounts to over $40,000, taking the different items together
—carriage tolls, admissions to carriages, and admissions in
right field seats. It is hardly necessary for me to say to you
that if there was any reasonable way—any practicable way in
which, by a readjustment of its use of the grounds, the plaintiff
could have prevented any loss, by reason of the fact that its
gate upon Broad street was taken away, it was bound to do it,
in order to save expense to the city. If it be practicable, as
some of the witnesses for the defendant have said, to put a gate

on Huntingdon street, so that the plaintiff would get practically just as good space, and as convenient accommodation for carriages, as when the gate was on Broad street—if that can be done, that is an answer to the whole case. If it could have been done two years ago, that is an answer to the whole case, and the plaintiff was bound to do it. I do not think that it would be sufficient to prevent that answer from being effective to say that people on foot were going in that neighborhood, and it would be inconvenient to them. So it might, but would it be so inconvenient as to make it an unreasonable and improper method for the plaintiff to adopt? Is there a way that the plaintiff could adopt which would practically have removed the crowding of people at that point? Could it, as was argued to you by defendant's counsel, open a gate upon Broad street and run a passageway across to the end of the right field seats, so as to take people in there and prevent congestion at Carlisle and Huntingdon streets? I confess I do not see why something of that sort could not have been done. Again, how much would the carriages interfere with people who are going in on foot, through those turn-stiles at Carlisle and Huntingdon streets? The average was stated to be thirty carriages a day. Of course, that is not the same as a constant stream of carriages. In short, as between the parties, would it or not be a fair judgment to pass upon that question, that you must say that, by the removal of the opportunity to use the gate on Broad street, the plaintiff lost the opportunity of getting carriages into the ground which was formerly occupied by carriages, or that there is no other method which can be adopted which practically would amount to the same thing? If there is any other such method, then the plaintiff ought not to recover upon that head. In the same connection, I may refer to the fact that there is another part of the ground used for carriages, which formerly, according to the testimony, only took the overflow when that place at the southeast corner was filled, but which since that has not been used. During the last year or two, they are stated to have had an average of about twenty carriages a day there. Now the question is, coming to what is fair and just between the parties, whether, after all, notwithstanding it may not be so convenient in some respects, that other place is not going to be used practically to the same ex-

tent that the old place was, or if not, whether the old place cannot be utilized as soon as this controversy is settled and the parties settled down, and things are arranged as they finally will be. What I have said upon that point applies as well to the other item of $27,000 for admission in carriages, because if the carriages can get in in any way which is reasonable and practicable then that item would not be lost.

There is also another item of $13,500, based upon the alleged loss of sixty seats upon the lower row at the end of the right field seats. You will observe that these figures get to be pretty large when you take them for twelve years. Of course, if the loss of those sixty seats, supposing they were lost, is the result of the change of the grade which the club did for its own advantage, and not because it is necessitated by the work of the city—if the loss occurred as the result of the elevation of the grade which the club did, in order to make more rapid drainage than it otherwise would have had, in any event, and even before the change of grade, then the city is not responsible for it, and that would put an end to that claim. But aside from that, is it or not reasonable to say that the city should pay such a sum of money for such a reason? Of course, if it be reasonable, it is only so because all the rest of that ground would have been filled, and that the people who should sit in those sixty seats would not sit anywhere else, because if there was space elsewhere to put them, if they could not get those seats, they would get some others.

Another way of looking at it is, would it or not have been practicable, I do not mean possible, by the exercise of the highest skill and the expenditure of a large sum of money, but readily practicable, to have put seats somewhere else, which would have answered the same purpose? Are you to assume that, because sixty seats running along the lower tier at a given point are lost, a corresponding number cannot be put somewhere else? The question is so serious a one in its consequences that you are bound to look at it in all those phases.

I have said to you what I now repeat briefly, that whatever the plaintiff, by the evidence, has satisfied you it has actually lost, or must lose in consequence of this change of grade, it is entitled to be paid, and the city, as matter of law and fairness, should pay that amount. The plaintiff, however, has no right

to claim any more, and the city ought not to ask to be allowed to pay any less. If the plaintiff has given you the correct amount of what is due, under such a statement of the liabilities of the defendant, then your verdict should be for that amount. On the other hand, if the defendant has presented to you, through its witnesses and counsel, a correct view of the case, then the amount, as claimed by the defendant, should be the amount of your verdict, it being increased in either case by the amount requisite to make compensation for detention in the payment of the money. If you are not satisfied with either claim, then you should take the case up and reach your own independent conclusion.] [1]

Defendant's point and answer thereto among others were as follows :

There can be no recovery in this case for the item of $13,500 alleged loss of seating capacity in the right field seats caused by the raising of the ball field. *Answer :* I cannot affirm that point, but I have already stated to you all that I need state on the subject. If there was a loss of those seats, which could not have been provided for in some other way, and that was caused by the action of the city, then I think the plaintiff would be entitled to recover for whatever it lost, from a reasonable point of view—that is, whatever you believe to have been the actual loss which must have occurred in consequence. [2]

Verdict and judgment for plaintiff for $29,761.98. Defendant appealed.

*Errors assigned* were (1, 2) above instructions, quoting them.

*R. Alexander*, with him *John L. Kinsey*, for appellant.—The learned trial judge all through his charge treats the various items which make up loss of future income, as he styles it, as separate items, which the jury may find and add together in making up their verdict. He should at least have told the jury these items could not be allowed as such, and could only be considered as affecting the market value of the leasehold: Kersey v. R. R., 133 Pa. 234; Ry. Co. v. Vance, 115 Pa. 325; Western Pa. R. R. v. Hill, 56 Pa. 460.

It is the condition of the property at the time of change of grade that is to be considered : Markle v. Phila., 163 Pa. 344.

*John I. Rogers*, for appellee.—The loss of custom or business may be proved in order that the jury may arrive at the total depreciation of the property: R. R. v. Hill, 56 Pa. 460; Kersey v. R. R., 133 Pa. 234; Ehret v. R. R., 151 Pa. 158.

The depreciation was established by the testimony of a competent witness: Ry. Co. v. Vance, 115 Pa. 325; Dawson v. Pittsburgh, 159 Pa. 317.

OPINION BY MR. JUSTICE GREEN, October 11, 1897:

This was a proceeding to recover damages for changing the grade of Broad street, at a point adjoining the plaintiff's ball park, situate at Broad and Huntingdon streets, Philadelphia. Changes were also made in the elevation of other streets intersecting Broad. It was claimed by the plaintiff that damages had been sustained by means of the change of grade to the amount of $85,215.03, and the testimony of the chief witness examined for the plaintiff was directed to the establishment of that claim. In doing this he estimated the value of the plaintiff's leasehold before the change at . . . $296,000.00

|  |  |
|---|---|
| Made up of |  |
| Cost of fixtures and improvements, . . | 110,000.00 |
| Value of business stand over rent for remainder of lease, . . . . . . | 186,000.00 |
| He then estimated the value of the leasehold after the change at . . . . | 210,785.00 |
| And claimed a depreciation in value resulting at . . . . . . . | 85,215.00 |
| When asked to explain this sum he said there were injuries to fixtures amounting to . | 28,415.03 |
| And injuries to business by loss of income . | 56,800.00 |
|  | $85,215.03 |

Various items of new work were enumerated which amounted, some by estimate, and some by actual cost, to . . . . . . $28,415.03
Another item called loss of revenue was stated at    56,800.00
and thus the aggregate of loss was arrived at as being $85,215.03 and this being deducted from the total valuation of $296,000 before the change, indicated how it was ascertained that the value of the leasehold after the change of grade was finished was $210,785.

In order to test the legal correctness of this mode of estimating the damage it is necessary to review the items. Of the aggregate injuries to fixtures amounting to $28,415.03, the witness admitted that the amount really expended was less than $10,000. · He was asked: " What was the total amount of money which the Ball Club expended in 1893, 1894 and 1895 on that place to remedy any injury done by the change of grades on the highway—state it in dollars and cents? A. We spent less than $10,000. Q. How much less? A. We spent $9,174.08. I think that is correct. Q. What did you spend it for? A. That was including drainage connecting with the sewer at the corner of Broad and Huntingdon streets, $206.80 ; regrading field for proper drainage, $5,600; sign painting $237. I did not include the trees and tree boxes, because we have not put them back yet. That includes also score boards, $100, and store at corner, $832.87. Q. That is loss of rent? A. No, that is for building. Also right field gate at Huntingdon and Carlisle, altering it, cement work $150 ; temporary fences $1,627.89 ; extra police on right field for two years $350 ; canvas $57.52 ; photographs $12.00. Q. That is these photographs here? A. Yes, sir; that is all the actual money expended, I believe. Q. That is every dollar that you have paid up to date? A. Yes, sir, to the best of my knowledge that is right. Q. That is all that was expended because of the change of grade of the highways? A. Yes, sir. Q. The $5,600 represents the regrading of the property? A. Yes, sir. Q. You played ball in 1893, 1894 and 1895, without that regrading, did you not? A. Yes, sir. Q. So that without the regrading, your expenditures would be $3,574.08. A. Yes, sir."

It therefore appears that, out of all the actual and estimated expenditures which it was claimed would amount to $28,415.03, the total amount of payments which really were made was $3,574.08. The change of grade of the ball park was not made until after 1895, and was not a necessary consequence of the change in the grade of the streets. It cost $5,600, and it is not easy to see why any claim should be made upon the city to pay for it.

The principal items of the plaintiff's claim are made up of alleged losses in the plaintiff's business ; thus, for carriage tolls

for twelve years at ten cents admission for thirty carriages each
day, at seventy-five games each year,  .    .    .    $2,700

Admission for two passengers in each carriage at
$1.00 for 12 years,  .    .    .    .    .    27,000

Total,    $29,700

Destruction of 60 seats caused by regrading of
back seats—admission thereto for 12 years  .    13,500

Loss of facilities for other sports  .    .    .    3,000

Incidentals and general damages    .    .    .    10,000

Total damage to business by loss of revenue or
income  .    .    .    .    .    .    .    $56,200

It will be perceived at once that in order to lay any founda-
tion for such a claim as this it would at least be necessary to
show that, in point of fact, there was an actual loss of income
bearing some proportion to the amount claimed. Yet in reality
there was no loss of income proved at all. On the contrary,
the plaintiff's chief witness testified as follows: "Q. How did
the admittances during the year 1893 compare with those in
1892? A. I think we had more people in 1893 than we had in
1892. Q. Did you not have more in 1894 than you had be-
fore the change of grade? A. Yes, sir. Q. How about 1895;
A. We had more then. Q. Then you have more people in the
grounds since the change of grade than before—that is true
is it not? A. Yes, sir. Q. A good many thousands more?
A. Yes, sir, a few thousands more." In another portion of his
testimony the witness was asked: "Q. State the number of
people in attendance at the ball park in 1892? A. 197,574.
Q. How many in the year 1893? A. 293,925. Q. How many
in the year 1894? A. About 325,000. Q. How many in the
year 1895? A. Over 400,000."

Now it is said in the appellee's counter statement, and not
denied, that the work of changing the grade of Broad street was
begun early in 1893 and was completed in September or Oc-
tober, 1894, and it was agreed on the trial, "that August 1, 1893
should be taken as the date when the change took place." We
then have the undisputed fact that, instead of there being any
loss in the actual business done after the change of grade, there
was a very large actual gain. During the year 1893 there was
a gain of 96,351 admissions over 1892. In the year 1894 there

was a gain of 127,426 over 1892, and of 31,075 over 1893. In 1895 there was a gain of more than 202,426 over 1892, and more than 75,000 over 1894. As the year 1892 was the last year before the change, the proper comparison should be made with that year, in order to determine to what extent the business before the change was made, was injured by the making of the change. The court very correctly charged the jury that they could only consider the change in the value of the leasehold as it was before the change of grade was made and after it was made, and while they might consider evidence as to matters of income before and after, they could allow as damages nothing but the difference in the value of the leasehold, and could not allow specific claims in loss of items of business. But the appellant's complaint is that there was no proof of actual loss of business, but on the contrary the undoubted proof, made by the plaintiff's own testimony, was that there was a large increase in the business, and hence the claims for loss of value of the leasehold on account of alleged loss of business, should be stricken out altogether, and entirely disregarded by the jury. Now, upon comparing the business of 1893 with that of 1892, it will be found that there was a gain of very nearly 50 per cent over the business of 1892. The business of 1894 showed a gain of just about 65 per cent over the business of 1892, and of 10.6 per cent over that of 1893. The business of 1895 showed a gain of more than 100 per cent over that of 1892, and a little rising of 23 per cent over that of 1894. In this state of the testimony it is absolutely established by the affirmative and uncontradicted evidence of the plaintiff that there was, not only no loss of business resulting from the change of grade, but a very large increase of business between the time before and after the change. If a legitimate deduction as to the value of the leasehold before and after the change was made, may be derived from the condition of the business before and after, then its value must have been largely increased during that period, and in no possible sense can it be regarded as having decreased. Courts and juries must deal with facts as they find them. In this particular case we find there was a positive and large increase in the business of the club after the change. Hence it is not true that there was or could be a diminution in the value of the plant on account of a loss of business, for the simple reason that

there was no loss. It is no answer to say that there was a natural increase of business from year to year, and hence the club might have done a still larger business if the grade had not been changed. The palpable answer to any such contention is that no human being could know that such would have been the fact, and hence he cannot so testify. No mortal man now knows whether the business of this club will be larger or smaller in 1898 than it is in 1897. It may be larger or it may be smaller depending upon numerous contingencies which cannot possibly be foreseen. The business in which the plaintiff is engaged is a mere recreation. If times are good and general business of the whole community is prosperous, and if the public desire for this kind of recreation increases, the business of the club may be larger next year than it is in this. If on the contrary business depression and prostration ensue, or if the public desire for such recreation decreases, the business of the plaintiff will with almost absolute certainty largely diminish. It is not a fixed and stable business, having definite limitations. It is a mere amusement, and nothing can be more fickle and uncertain as to their endurance than the mere amusements of a community. We all know how the skating rink fever arose and spread at a furious pace some years ago, inducing investments of immense sums of money in its practical development, and yet in a very few years it collapsed utterly. Other instances of a similar character could easily be indicated. Even in the particular business of this club it is notorious already, and matter of public history, that it is only in large cities that it can even now be maintained with profit. In a vast number of localities where it formerly attracted great public interest it has already died out and been discontinued. But in a mere legal sense, and that is the way we are obliged to view it, the radical and fatal vice of the contention we are now considering is that it is entirely too remote, altogether imaginary, and purely speculative to the last degree. All the elements of certainty in deductions are absent. They exist only in the future and therefore cannot be known, they depend upon the most variable and uncertain conditions, and they cannot possibly form the basis of a sound and reliable judgment.

In this particular case there was no loss of business during the period in question, and therefore no jury should be permitted

to render a verdict upon a theory that there was a diminution in the value of the leasehold because of a loss of business. It was just here we think that the learned court below was led into error. They did caution the jury repeatedly that they could only allow for a diminution in the value of the leasehold before and after the change of grade, but they did nevertheless permit the jury to consider the subject and allow damages for the change, upon a theory that there was, or might be, a loss of income, when, as we view the testimony, there was no evidence in the case upon which such a theory could be based. All the testimony was the other way. We cannot consider it safe to leave to a jury the determination of such a question upon such evidence as we find on this record. We are of opinion that the jury should have been instructed that there was no sufficient evidence in the case to justify them in allowing any damages whatever to the plaintiff for alleged loss of income, whether in the three years which had already elapsed, or in the remaining years of the lease. This is most particularly applicable to the claim for $13,500 for the loss of sixty seats, and the claim of $29,700 for the loss of income from carriages and their occupants. There is absolutely no proof in the case that either of these matters affected the income of the club to the extent of a single dollar. But our view of the testimony affects the entire subject of alleged loss of income in estimating a diminution in the value of the leasehold before and after the change. There was no such loss, and therefore no verdict can be allowed upon a theory that there was. We sustain both the assignments of error.

Judgment reversed and new venire awarded.