## The Philadelphia Ball Club, Limited, v. The City of Philadelphia, Appellant.

*Eminent domain—Streets—Change of grade—Damages—Value of business—Measure of damages.*

Where a property has been injured by the change of grade of a street, its valuation must be made immediately before and immediately after the injury is inflicted, and the difference in these valuations is the measure of the damages which the owner may recover.

In a proceeding against a city to recover damages for injuries caused by a change of grade to land leased for the purposes of a base ball park, it is improper to permit the jury to take into consideration estimated annual profits of the lessees during the continuance of the lease, or the cost of changes and improvements made in the park three years after the work of changing the grade of an abutting street had been completed.

*Eminent domain—Land damages—Detention of payment.*

In a land damage case, the owner of the land is not entitled to damages for detention of payments, where it appears that the detention was caused by his grossly excessive and unreasonable demands, which it was the duty of the officers of the city to resist.

Argued Jan. 10, 1899.   Appeal, No. 223, Jan. T., 1898, by defendant, from judgment of C. P. No. 4, Phila. Co., June Term, 1893, No. 1190, on verdict for plaintiff.   Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ.   Reversed.

Appeal from award of road jury.   Before AUDENRIED, J.

At the trial it appeared that the damages claimed were for injuries caused by the change of grade of Broad street abutting upon the plaintiff's ball ground. This change of grade took place August 1, 1893. The elements of the damages claimed are stated in the opinion of the Supreme Court.

The court charged in part as follows:

Mr. Rogers, Mr. Shetzline, and Mr. Reach, all of whom qualified as experts, that is, as people acquainted by their experience and observation of sales with the value of property such as that which is involved in this case, testified that the fixtures and leasehold of the Philadelphia Ball Club, Limited, were worth between $296,000 and $300,000. Of that amount I think they place the value of the company's fixtures, that is, its buildings, seats and conveniences on the land, considered separately and apart from the value of their interest in the land itself under their lease, at $110,000. The difference between $110,000 and the sum total fixed by them as the value of the whole property of the ball company, was the value of the leasehold. About this question there was not any dispute. No witnesses were called to contradict what the witnesses I have mentioned to you said as to the value of the plaintiff's property before the change of grade was made. Now, let us see what the evidence is as to the value of its property after the change of grade took place, in view of any effect on that value which the change of grade may have produced. Mr. Young, who is an officer of the National Base Ball or Athletic League —I forget the exact title of the association over which he presides—valued the fixtures and leasehold interest of the plaintiffs after the change of grade, in view of the effect which the change of grade had upon it, at $236,918. Mr. Rogers fixed the same valuation upon the company's property. Mr. Shetzline regarded the value of the property of the ball company at $229,913. Mr. Reach fixed its value at $232,917. These estimates do not differ very materially. These gentlemen were examined as to the manner in which they had arrived at the estimate of value of the ball company's interest in this property and its fixtures after the change of grade, and they described to you how they arrive at their figures. Whether you take their estimates or not will depend on whether you regard their explanations of

their calculations, their explanations of the manner in which they came to those estimates, as proper and correct ones. That there was some depreciation in the value of the plaintiff's property here is not denied. Counsel for the city has stated to you that they admit there has been some depreciation. As to certain elements of depreciation there is no dispute. Those elements I may enumerate to you, and you are bound to consider them as fixed quantities in determining to what extent the value of the plaintiff's property has been affected by this change of grade. There is no dispute that this change of grade caused the destruction of the plaintiff's trees and the iron boxes which surrounded those trees. The value of those trees, it is agreed, was $399.50. There is no dispute that a score board, which is said to have been worth $100, was destroyed, or its destruction rendered necessary by this change of grade. To that extent also the value of the property is affected. It is not denied that this change of grade rendered necessary certain temporary changes in the drainage of the ball park during the year 1894, to make it fit for use. The cost of that drainage amounted to $206.80. It is undisputed that certain signs which had been set on fences along Broad street and along the right of way of the Reading Railroad Company, were rendered useless by the fact that the change of grade involved the necessity of taking down those fences on which the signs were set out, and that the cost of those signs was $237. It is not denied, as I understand, that this change of grade rendered necessary certain alterations in the gate which led into the ball park at the corner of Carlisle and Huntingdon streets, and that those alterations amounted to $250. Nor is it denied that certain carriage stalls under the right-field seats were rendered useless in that position by this change of grade, and that the cost or value of those stalls lost by the plaintiff was $250. It is not denied that the carriage gate, that handsome structure about which you have heard so much, leading from the ball park out into Broad street, just north of Huntingdon street, which had been erected at a cost of $1,267, was made useless, and its removal necessitated by this change of grade, and it is agreed that during the year 1893 and the early part of 1894, while the change of grade was being made in Broad street certain expenses were rendered necessary to make it possible to continue the use of that park

as a resort for public amusement. These expenses included an item for temporary fences, an item for police pay to secure protection from those who would view the games conducted there without paying admission, and an item for new screens made necessary through the removal of the walls. These items amount to $2,035.61. There is no dispute that the change of grade at Broad and Huntingdon streets left the store building, built at this point by the plaintiff, in such a position that it could not be used, and caused a loss of rent amounting for one year to $600, and necessitated the change of location of that store by its being lifted up, so that it might be entered from Broad street at this new grade, and this cost some $800. Nor is there any serious dispute that this change of grade necessitated the raising of the walls which had bounded the base ball park along the Broad street side. There is some question as to whether the cost of this raising of the walls so that they would be of the same height above Broad street at the new grade as they were above Broad street at the old grade, amounted to $15,000. The difference of opinion there is due, I think, to the question whether the walls could not have been raised simply by the addition of so many more courses of brick, or whether it was really necessary to take down what there was there and put in stronger foundations, so that the higher walls might have an adequate and proper support. That a change in the height of the walls was made necessary by the change of grade in Broad street is undisputed. The question at this point for you to determine is, What was a proper and necessary outlay to construct such walls as would be of the same relative value to the property and accomplish the same result relatively with respect to the changed conditions which prevailed there after Broad street had been raised, that the old walls had accomplished before the change of grade was made? If you believe from the evidence which you have heard given by Mr. Ballinger, who I think estimated on the cost of this improvement, and take the view that the tearing down of the walls and building foundations was reasonably necessary and indispensable to the construction of proper walls, then there is no question that $15,000 is the proper allowance to be made in respect to that matter.

The total damage claimed by the plaintiff to have been caused to its fixtures, its walls, its seats, the surface of its ground, its

drainage and all that, by the change of grades in the surrounding streets, was, I think, some $38,000. This was made up of these undisputed items to which I have already directed your attention, and two other items which are not undisputed, but which are very strenuously objected to by counsel for the city. [The first of these is an item of $6,589.63 for changes which the plaintiff claims were necessitated by the change of grade in the surrounding streets, to the grade of the base ball park itself, so that the park could have that drainage which it seems to be admitted all base ball grounds require. Whether this change of grade of the base ball ground was really necessary was necessarily involved by reason of this change of the surrounding streets, is a question which you will have to determine. If the change of grades in the streets in your judgment did not necessitate any change of the grade in the base ball ground for the purpose of giving the ground of the base ball company the same good drainage which it has been testified they had before these changes in the streets took place, then you must not consider this item of $6,600 as any element of depreciation when you come to make up your minds what was the value of the company's leasehold and fixtures as they were left after the change of grade of the streets. If you do not believe that there was any reasonable necessity for the base ball company's change of its grades, and the putting in the sewers or drains that you have heard so much about, if you believe that the grounds would have been adequately drained by the provisions contemplated by the city, by the use of the ten-inch trough that I think has been testified was there formerly, and its connection with the sewer through a pipe left in the Broad street retaining wall, then there should be no consideration whatever paid to this matter and no depreciation allowed in that respect.] [4] [Another disputed element of depreciation claimed by the plaintiff is the expense of changing the right-field seats and of making a carriage entrance reasonably similar to the old gate which had existed at Broad and Huntingdon streets prior to the change of grade. It is claimed that because this outlay was rendered necessary the value of the property of the plaintiff here was diminished to the extent of $9,871.28. Whether any such change was necessitated by the changes of grade in the surrounding streets is a question which you must deter-

mine. If you believe, in the light of the evidence which you have had given before you, that this change of the right-field seats was rendered reasonably necessary to the use of the park by anything that the city did there, and that the cost of such changes as were rendered necessary in this way, if you find any to have been rendered necessary, would have amounted to $9,871.28, then you may consider that item as one of the elements in the depreciation of the property. Otherwise you must not consider it.] [7] So much for the depreciation in the market value of the fixtures of the Philadelphia Ball Company, Limited.

Other claims are made by the plaintiff here, and these are threefold. [The company claims that this leasehold interest—that is, its interest in this park as tenant for the remainder of its term—has been seriously affected by the change of grade necessitated in its ground by the change of grade in the surrounding streets, or rather it claims that the drainage of its grounds is not as good for its purposes now, even after it has done all that it can to correct that matter, as it was before the change of grade in the streets took place. It is alleged that a leasehold interest in property drained as this was prior to the change of grade of the streets, a property where the natural surface drainage was such that within a short time after a comparatively heavy rainfall the ground would be so dry that a game of ball could be played, has a much greater value than a leasehold interest in property where the drainage is as it is stated the drainage of this particular property is at present. You must determine from the evidence whether there is any material difference between the drainage of that base ball park now and its drainage as it was before the change of grade of the streets was made. If there is any difference, then you may consider to what extent this element of depreciation affected the value of the plaintiff's leasehold. It is your right to apply the test of your own common sense to the figures which have been given you as to the effect which the alleged inferiority of drainage facilities affected the value of the plaintiff's leasehold, and I need only mention those figures. Colonel Rogers is of opinion that in respect to the impairment of the drainage facilities of the company's tract, the company's leasehold interest suffered to the extent of at least $1,000 a year

in the aggregate, and in consideration of the fact that the company's lease had some twelve years yet to run from August 1, 1893, the company had suffered in this respect to the extent of $10,000.  In this he was corroborated by the testimony of three or four other witnesses called on behalf of the plaintiff, one of them fixing the depreciation in respect to this change of drainage at as high a figure as $12,000.] [9]  Another element of depreciation reckoned by the plaintiff, and claimed in this case, is the sum of $3,000 in respect to the extra expenses of maintaining the higher walls along Broad street necessitated by the change of grade of Broad street.  Whether or not any such extra expense is necessary you must decide, and, if necessary, you will have to decide what is a proper allowance for that burden.  These matters, about which I have spoken to you, which have been considered at such length by counsel, and as to which so much testimony was given before you by the witnesses, are all important only in determining the market value of the plaintiff's property after the change of grade in the surrounding streets had been made, and those changes of grade had affected the property's market value.  In other words, our inquiry is, what were these fixtures and what was the plaintiff's leasehold worth in the market after the city had changed the grade of Broad street and Huntingdon street? What would any reasonable man pay for it?  Of course, anybody going to buy the interest of the Philadelphia Ball Company in this park, and in the building and benches and fixtures, would be willing to pay for them only what he considered they were worth, and his opinion as to what they were worth would be based largely on what he would have to spend upon the property to make it convenient and suitable for a continuation of the business for which alone it could be used.  He would naturally take into consideration all the reasonable consequences of this change of grade in the surrounding streets.  Any one buying that leasehold would buy it in full contemplation of the fact that the walls there would have to be raised ; that the drainage, if it had been left defective, would have to be corrected ; that the gates which formerly left carriages out into Broad street at grade could no longer be used for that purpose, and would have to be changed to some other location ; that the trees, and boxes surrounding those trees, had been rendered

worthless and would have to be taken away; that while the city was changing the grade of Broad street policemen would have to be hired and paid to keep the boys from looking down into the park free while the games were going on, and that temporary fences would be required for the same purpose. All those things would naturally be taken into account, and it is this that I mean when I say that this evidence is to be considered by you only as affecting the question of how much was the market value of the plaintiff's fixtures and leasehold after the change of grade of the streets had been made, as they were affected by that change of grade.

Finally, after you have fixed the value of the property involved in this litigation before the change of grade and the value of that property as affected by the change of grade after the change had been accomplished, and determined what the difference between those two market values is, and in that way determined to what extent the plaintiff here has been injured by the act of the city, you must add to that, reasonable compensation, for the fact that these damages suffered by the plaintiff, to which in theory the plaintiff was entitled at once upon the change of grade being made, that is, on August 1, 1893, have not yet been paid. You must add to the damages which the plaintiff suffered reasonable compensation for the detention of those damages, and return a verdict here for a round sum, including both the damage for the injury to its property and its damage in respect to the detention of that money up to the present time. That is not interest. That is compensation for damage caused by the city's delay in this behalf.

Verdict for plaintiff for $39,089. Judgment was entered for $30,000, upon plaintiff remitting $9,089.

*Errors assigned* among others were (4, 7, 9) above instructions, quoting them.

*R. Alexander*, with him *John L. Kinsey*, for appellant, cited Markle v. Philadelphia, 163 Pa. 344; Richards v. Citizens N. Gas Co., 130 Pa. 37; Klages v. Phila. & Reading Terminal Co., 160 Pa. 386; Becker v. Phila. & Reading R. R. Co., 177 Pa. 252.

*Alex. Simpson, Jr.*, with him *John I. Rogers*, for appellee.

OPINION BY MR. JUSTICE GREEN, October 6, 1899:

The solution of the questions arising upon this record is not difficult if we do but define with accuracy the rule which controls the assessments in all cases of this character. There has never been a better statement of that rule than was given in the case in which it originated. Although that decision was made seventy-eight years ago, it has proved itself equal to all the emergencies and contingencies, and all the ever varying conditions and questions that have been developed in the almost innumerable cases that have arisen since it was pronounced. Fortunately the original case was not one of the mere taking of land by a railroad company, and more fortunately still it presented and decided a question of future results which it was contended might, or would, have happened after the direct injury was inflicted. Since that day, in an infinite variety of circumstances, it has been sought to found a right of recovery upon subsequent events not in existence at the time of the injury, but which it was claimed might, or would, result with a greater or less degree of natural or probable sequence from the injurious act or appropriation complained of. But the doctrine then announced for the first time has proved to be so just, so sensible, so reasonable and yet so entirely adequate to the proper and legitimate demands of the party injured, that it has received the constant and persistent sanction and approval of this Court through all the years that have since elapsed to this very day. The case referred to is The President, Managers and Company of the Schuylkill Navigation Co. v. Thoburn, reported in 7 Serg. & Rawle, 411, and decided in the year 1821. The opinion was written by Mr. Justice GIBSON. It was not a case of the taking of land, but of injury by the flooding of the plaintiff's land with water. It originated under the provision of the 10th section of the act of March 8, 1815, incorporating the Schuylkill Navigation Company, which gave a remedy for the inundation of land by means of dams erected in the river in the creation of the system of slack water navigation of the river Schuylkill. The plaintiff was the owner of a cotton mill erected on, and near to the mouth of, a small stream tributary to the river, and when a dam was built in the river below the stream the water flowed upon the land of the plaintiff and into the tail race of his mill, so seriously that the water power

of the mill was destroyed and the owner was obliged to remove
his machinery to another mill.   Of course his injury was most
serious, and it was direct.   One of the claims of the plaintiff
was for damages resulting from the loss of his business which
would occur after the injury.   Another question was as to the
time at which the damages were to be estimated as having been
suffered, and these two were the principal contentions in the
case.   Mr. Justice GIBSON in the course of the opinion thus
states and disposes of these questions : " The material inquiry
is : at what point of time were the jury to estimate the damages
as having been suffered ?   Indisputably, at the time when the
injury complained of was complete ; which was the moment
the dam was finished ; or rather when the obstruction, by swell-
ing the water, permanently produced its most injurious conse-
quences.   The principle that the extent of an injury at the
time it is suffered is to govern the compensation to be received,
without regard to enhancement from subsequent circumstances,
is familiar and applicable to all cases which I at present recol-
lect, where compensation is to be made in damages. . . . The
compensation was to be prospective, as well as retrospective ;
but to be estimated with reference to the time when the injury
was committed.   It was in fact to be the price of a privilege
to swell the water to a particular height for an indefinite time.
Now this price was due the moment the privilege was entered
upon and the price could be ascertained, which was obviously
the time when the obstruction was first completed.   The jury
were therefore to ascertain what was then due ; and the amount
clearly could not be enhanced, or in any way affected by sub-
sequent injuries, the consequences of the obstruction.   How
far the omitting to instruct the jury to this effect may have
operated on the amount of the compensation assessed I am
unable to say, as the bills of exceptions contain no more of the
evidence than is absolutely necessary to an understanding of
the points submitted ; but as the particular injury to the plain-
tiff in his business as a manufacturer was necessarily subse-
quent to the erection, and as the defendant prayed the direction
of the court on the legal effect of the evidence relating to that
part of the case, he was entitled to have it, for, so far, it would
have operated in his favor. . . . The jury are to consider the
matter just as if they were called on to value the injury at the

moment when compensation could first be demanded; they are to value the injury to the property without reference to the person of the owner or the actual state of his business; and in doing that the only safe rule is to inquire what would the property, unaffected by the obstruction, have sold for at the time the injury was committed? What would it have sold for as affected by the injury. The difference is the true measure of compensation."

It may be well enough to pause at this point before referring to other authorities to consider the application of the foregoing decision to the facts and questions arising in the case at bar. It was a case of injury and not of taking. There was a manifest, serious and real injury inflicted directly upon the owner by the act of the defendant company. It involved necessarily a question of future results in depriving the owner of the business, and its profits which would occur in the future. About that aspect of the case there could be no question. But this Court held, (1) that only the difference in the actual value of the entire property before and after the injury was inflicted could be considered; (2) that the time at which this difference of value was to be estimated was immediately after the injury was completed; (3) that no consideration could be given to circumstances occurring after the completion of the injury; (4) that in no event could there be any recovery for loss of profits of business resulting from the enforced abandonment of the mill and its machinery; (5) that there could be no recovery for any damages which were imaginary, speculative or remote.

All of these rulings have been repeatedly sustained and enforced ever since the Thoburn case was decided.

Applying these principles to the present case let us inquire how it is affected by them. The plaintiff ostensibly sought to conform to at least the letter of the rulings above stated. The witnesses were asked to state what was the depreciation in the market value of the leasehold caused by the change of grade in the streets. They did this in this way. They fixed a valuation of the leasehold at the sum of $296,000; one of them $300,000. They then specified a number of items of damage caused by the change of grade according to their ideas, and made the aggregate of these items $61,082. Deducting this from $296,000 left a resulting sum of $234,918, and that sum

they said was the value of the leasehold after the change of grade. As a matter of course the legal sufficiency of this kind of an estimate depends absolutely upon the character of .the details which make up these aggregates. Looking at the method by which the valuation of the leasehold before the change of grade was worked we find it consisted of a valuation of $110,000 for all the buildings, improvements and fixtures of the park, and $186,000 as the value of the business to be done during the remainder of the term of the lease after the change of grade was made, to the end of the lease. It seems incredible that this method could have been allowed or could have received any kind of sanction, but a few citations from the testimony will demonstrate the correctness of the statement. The witness who invented this mode of fixing a valuation was the largest stockholder of the plaintiff company; he was the chief witness in behalf of himself and his company, and was also one of the counsel in the case for the plaintiff. He was asked: " Q. Tell us what in your judgment the market value of the leasehold of the Philadelphia Ball Club, Limited, was, immediately prior to the change of grade of Broad street? A. I valued it then at $296,000, after careful examination. Q. Will you tell us what was the market value of that leasehold immediately after the change of grade, as affected by that change? A. I valued the leasehold immediately after the change of grade at $234,918. Q. Making a depreciation caused by the change of grade of how much? A. $61,082. . . . Q. The value as given by you before the change of grade includes what? A. It includes the balance of the lease which was twelve years and five months to run, and the fixtures of the ball park, consisting of all its buildings and improvements, fences, gates, ticket offices and everything which I knew was worth $110,000. That included in the estimate of the whole thing I made $296,000." According to this the value put upon the lease for twelve years and five months was $15,000 per annum.

The method was more clearly explained by the witness, A. J. Reach, who was the president of the club. He was asked: " Q. You value the whole thing before the leasehold at $296,000? A. Yes, sir. Q. How did you make up that value before? A. As I said a moment ago, I went to the club's office and got

such information as I could, knowing I was to be a witness here, and our improvements cost $110,000, what we had at that time, our buildings and so on.   In figuring over what our profits were and averaging, it would be a low estimate to figure them out what the difference would be in twelve years; in other words something over $15,000 a year.   Q. That is, I suppose, having counted $110,000 for fixtures, that would leave $186,000 to be accounted for?   A. Yes, sir.   Q. Then you said this leasehold runs twelve years?   A. Yes, sir.   Q. And you said there is a profit each year over and above what you have to pay for rent?   A. I said we struck an average for a number of years.   Q. The average net profit for a number of years, calculating for a number of years, would justify you in saying that there was in that leasehold $186,000?   A. Yes, sir."

Here it appears again that the valuation of the plaintiff's property consisted of $110,000 as the value of all the physical property owned by them, and $186,000 consisted of profits of business which were to be made in the future during a period of twelve years and five months.   If this is a lawful method of assessing a property which has been injured by an exercise of the right of eminent domain, then the decision of this Court in the Thoburn case was a wrong decision and ought never to have been made.   For we there said: " It is evident that the profit in any branch of manufactures must mainly depend on the amount of capital invested, the number of workmen employed and the extent of the business carried on; but it would be plainly unjust to put it in the power of the plaintiff, by an increase of all these to an amount beyond what the demand for the manufactured article would justify, to charge the defendant in the same proportion for the injury sustained by the impeding of his works in his business thus extended, as for a loss in his ordinary mode of carrying it on; that would make the defendant an insurer of ordinary profits in a new state of the business, pushed to a morbid extent, and would put it in the power of the plaintiff to increase the damages to any extent he might think proper.   I mention this to show the danger of taking into consideration circumstances posterior to the time when the privilege is fully entered on, and its consequences to the individual to be compensated are ascertained."

To sustain .the valuation upon which the present case was

founded the plaintiff in the Thoburn case should have been permitted to prove, first, the actual value of his physical property, including his land, his cotton mill, machinery and all his other tangible property, real and personal, and in addition to that to prove what the annual profits of his business were, and then to add the principal sum which those profits would represent at six per cent interest to the value of the physical property, and this court would have been bound to declare that the aggregate of these sums was the value of the plaintiff's property before the injury was inflicted. But we not only did not do that, and thereby sanction such an absurd proposition, but declared that the future profits of the plaintiff's business were not to be considered for any purpose whatever, not even to show the diminution in the value of his property by showing the loss of his future profits, when he was actually driven out of his mill and compelled to quit doing any business there. As a matter of course this manner of adding to the value of the actual property the value of future profits, which are entirely uncertain and may never be realized, was altogether illegal, and should never have been permitted. But bad as this feature of the plaintiff's case was, it was no worse than the other details of what the witnesses chose to describe as damages suffered by the change of grade. When asked to state how the $61,092 of loss was made up, they said it was composed in part of $38,082 depreciation in fixtures, $13,000 depreciation in the value of the leasehold and $10,000 for detention of payment. In making up the $38,082 item, they said it was composed in part of $6,589.63 for regrading the ball field, $9,871.26 for rebuilding right-field seats, $15,543 for rebuilding walls and fences, $1,267 for loss of gate, $1,627 for cost of fences and a number of smaller items. It is only necessary to deal with the larger items.

The depreciation in the value of the leasehold when described by the witnesses represented twelve years' loss at $1,000 per year, resulting from a supposed diminution in the receipts of the business, because the drainage after the change of grade was not as perfect as it was before the change. As a matter of course no such testimony could be permitted either before or after such a result occurred. But in point of fact there was not a particle of testimony to show that there was any diminution of actual receipts to that amount, and it was all a mere

guessing estimate of what the loss of profits would be on this account during the whole of the remaining twelve years of the lease. In addition to this, it was affirmatively proved by the plaintiff's witnesses that instead of a falling off of business during the years following the change of grade, from this or any other cause, there was an actual and large increase in the business. It was represented by the attendance of spectators in constantly advancing numbers, as follows: In 1892 the attendance was 197,574; in 1893 it was 293,924; in 1894 it was 352,773; in 1895 it was 414,891; in 1896 it was 357,025. We dealt with this subject when this case was here before, 182 Pa. 362, and then said: "Now, upon comparing the business of 1893 with that of 1892, it will be found that there was a gain of very nearly 50 per cent over the business of 1892. The business of 1894 showed a gain of just about 65 per cent over the business of 1892, and of 10.6 per cent over that of 1893. The business of 1895 showed a gain of more than 100 per cent over that of 1892, and a little rising of 23 per cent over that of 1894. In this state of the testimony it is absolutely established by the affirmative and uncontradicted evidence of the plaintiff that there was not only no loss of business resulting from the change of grade, but a very large increase of business between the time before and after the change of grade. . . . In this particular case we find there was a positive and very large increase in the business of the club after the change. Hence it is not true that there was or could be a diminution in the value of the plant on account of a loss of business, for the simple reason that there was no loss."

On this subject of the loss from inferior drainage, Mr. Rogers, the principal witness for the plaintiff, gave his views of the loss resulting from this source in the following manner: "After those things were done, or ought to have been done, the leasehold estate was depreciated in my opinion at least $13,000. Ten thousand dollars of that I think is a conservative estimate as to its injury by reason of the drainage being still very much inferior to the surface drainage that we formerly enjoyed." On cross-examination he said: "The $10,000 was after we had fixed our grounds in the best possible way; we have still a ground, that is, a base ball lease of ground, for twelve years and five months, that is worth in the market at least $10,000

less to a purchaser than it would have been if we had had surface drainage."

As the witness gave no explanation of his opinion except loss of business, he was asked as to how the business was after the change in the grade of the street was made and before the change in the grade of the field. He said, " The regrading of the playing field began in November or October, 1895, but we did not finish it." He was asked : " Q. You played ball through the year 1893, the change of grade commencing in August, 1893? A. Yes, sir. Q. You did not miss a day during that year, did you ? A. The balance of that year ? No, I think not. Q. You played ball there the year 1894, did you not? A Yes, sir. except on certain days when the condition of the ground did not let us. Q. There were three days you have stated during the year 1894 when you did not play ball? A. Three days when we were at home that we would have played but did not play ? Q. You played ball all through the year 1895 with the exception of one day? A. One day. . . . Q. How many days were you unable to play in the year 1896 on account of defective drainage ? A. The club played every game it was scheduled to play in 1896. Q. How many games were you unable to play in 1897 on account of defective drainage ? A. One."

Thus it seems that no day was lost in 1893, three days were lost in 1894, one day in 1895, none at all in 1896, and one in 1897. For this the city is asked to pay a sum of $10,000, by the testimony of this witness, and $15,000, by that of Shetzline, who was the secretary of the club, because the leasehold would be worth that much less, by reason of the loss of business, when in point of fact the business of the club steadily and largely increased during all the years until 1896. In 1896 and 1897 there was a falling off in the business and Mr. Rogers explained just how that occurred. He said : " The attendance at our ball games depends mainly on two circumstances, the most important of which is the luck of winning games after a close competition. If you have a close competition with the other clubs, and can win your share of games, the public come out in crowds. If you do not, they religiously stay away in crowds. That is the most important. The next important is having a place where it is the center of transportation facilities. That is the center of all transportation facilities of this town having the two main

railroads and all the trolley cars congregating there. . . . In 1896 we played very poor ball indeed, very wretched, and our attendance went down. In 1897 we did even worse, and our attendance went down." From this testimony it is apparent that loss of business is due to the quality of the play, and that the loss in 1896 and 1897 was due to the bad playing, while the business constantly advanced during all the years from 1893 to 1895, both inclusive, notwithstanding the condition of the drainage. It follows hence that any inference as to the value of the business at times posterior to the change in the grade of the streets has not the least importance which the law can recognize in the determination of the question of the difference in the value of the property affected, before and after the infliction of the injury. The writer has gone into the analysis of this testimony, not for the sake of showing what the real value of the business done on this property in the years succeeding the change in the grade of the streets was, but for the purpose of illustrating the wisdom of the rule which prohibits all such inquiries in cases of this kind. The business to be done in the future on, or with, a property which is taken or injured under the power of eminent domain, is uncertain, remote, imaginary, entirely incapable of being determined with truthfulness, and the testimony on such subjects is the result of the personal interest or the friendly bias of the witnesses, and hence necessarily and absolutely unreliable. Ever since the decision of the Thoburn case all such inquiries and all such evidence have been positively prohibited, and cannot in any circumstances be permitted to affect the decision of such cases as this. The underlying principle upon which such damage questions must be determined necessarily precludes the consideration of such testimony. For it is a fundamental proposition that the valuation of the property affected must be made immediately before and immediately after the property is taken or the injury is inflicted, and the difference in those valuations is the measure of the damages which the owner may recover. In the present case the change in the grade of the streets was made in August, 1893, and the value of the leasehold at that time, as contrasted with its value in the spring of 1892, when the work was commenced, must represent the damages to which the plaintiff is entitled. It was proved by the plaintiff's witnesses that the

ball playing went on during the years 1893, 1894 and 1895, just as it had been conducted previously to that time, without any change in the grade of the field, and with a largely increasing business. It was not until three seasons had been finished that any changes were made in the field, and after that time the work was done for which the very large damages in question are now claimed. As a matter of course these works and improvements, being long subsequent to the change of grade, could not lawfully have entered into the computation of the leasehold in 1893, for the very simple reason that nothing could be known about them at that time, they were long subsequent at the time of their occurrence. They were not at all a matter of necessity, but of mere improvement of the conditions of the field. The grade of the field was changed in the latter part of 1895, after the season had closed, and for this the plaintiff demands that the city shall pay as damages $6,589.63. There is no principle in the law upon this subject upon which this claim can be sustained. As the case was tried, the jury was allowed to award the whole amount of this work as specific damages for the change in the grade of the streets made three years before. It is too plain for argument that no part of it can be allowed, either specifically as the cost of so much work done, or as entering into the value of the leasehold at the time the grade of the streets was changed. If such a claim could be allowed for work done at the end of three years, there is no reason why it could not be allowed for work done at any time afterwards during the pendency of the lease. We rule now distinctly and positively that the whole of this claim must be rejected in any subsequent trial of this case. The same is true with increased force as to the claim for $9,871.26 for rebuilding the right-field seats. These seats were continued in use after the change of grade in the streets precisely as they had been before, until in August, 1894, when they took fire and were destroyed. They were at once rebuilt as they had been before and remained in use during 1894, 1895 and 1896. In 1896 the club decided to build an entirely new system of seats on a larger and much more expensive scale. They accordingly did so at an expense of $38,000, and they now claim that the city should pay one fourth of this sum, $9,800, upon the theory that it would have cost that much to rebuild the part which was required by the

change of grade. This work was not commenced until 1896, and finished in 1897, long after the present proceeding was begun, and several months after the first verdict was rendered. This work was done by the plaintiff for its own convenience and for the purpose of improving its business by making the field more attractive. It had nothing on earth to do with the change of grade in the streets, and in no conceivable point of view can a single dollar of this claim be allowed, or be permitted to affect the valuation of the leasehold in 1893, immediately after the change of grade in the streets. It must all be rejected for any purpose whatever.

Another claim was made on the trial which, if possible, is more indefensible than any of the others. It is a claim for $10,000 for detention of payments, on the theory that the plaintiff suffered damages on that account, and was entitled to be paid that amount in lieu of interest. If the plaintiff suffered any damage on this account it has nobody but itself to hold responsible for that result. It would have been a plain dereliction of duty on the part of the city officials if they had paid, without a contest in the courts, the grossly excessive and unreasonable demands of the plaintiff. In the former trial the claim was for $85,000, and it was sought to be supported by theories and testimony of such an illegitimate character that we were obliged to reverse the judgment, although the jury only allowed $29,000 by their verdict, thus condemning the whole of the demands in excess of that sum. On the last trial, other theories and testimony were set up in support of a demand for $62,000, quite as indefensible and unreasonable as the demand on the first trial. The jury on the last trial refused all of the claim over $39,000, and the court below struck out all over $30,000. It is therefore manifest that it is the oppressive and unreasonable demands of the plaintiff that have caused the delay in the payment of the damages really sustained by the plaintiff. As a matter of course there can be no recovery of any sum whatever for such a claim in such circumstances, and the whole of this claim must be rejected. It was error to leave such a question to the jury at all. In Richards v. Citizens National Gas Company, 130 Pa. 37, our Brother MITCHELL, in commenting upon claims of this character, and speaking for the whole court, said: " Interest is recoverable of right, but compensation for

deferred payment in torts depends on the circumstances of each case.  The plaintiff may have set his damages so inordinately high as to have justified the defendant in refusing to pay.  Or in other ways the delay may have been the plaintiff's fault. . . . In such cases the jury probably would not, and certainly ought not, to make the allowance."  It is altogether likely that when the two persons who own the majority of the stock of the plaintiff company, can make up their minds to accept a fair and reasonable sum for their claim an adjustment will quickly follow.  But it must not be expected that the imaginary, remote, speculative and illegitimate demands that have thus far been set up, or any others of like character, will ever receive the sanction of this Court.  There are other objectionable items in the plaintiff's claim, but as they are not covered by any of the assignments of error we do not discuss them.  The fundamental method which was adopted to establish the difference of value in the leasehold before and after the change of grade is radically vicious and fallacious.  Fixing a valuation before the change by adding the anticipated profits of twelve years and five months in the future, to the value of the physical property, is so glaringly and violently in opposition to all our decisions that it must be entirely rejected in any future trial of the case.  Then the method of building up an extravagant mass of items of alleged damage, nearly all of them based upon future transactions, remote, imaginary, speculative and altogether illegal, and naming the aggregate of all of these as the difference in the value of the leasehold before and after the change of grade, is so certainly contrary to the law of this commonwealth that it cannot possibly be sustained.

Some reference to a few of our more modern decisions will be appropriate in this connection.  In the case of Watson v. Pittsburg & Conn. R. R. Co., 37 Pa. 469, we said, speaking of the claim of the plaintiff: " He was allowed the benefit of the rule laid down in Schuylkill Nav. Co. v. Thoburn, 7 S. & R. 411, that the true measure of compensation is the difference between what the whole property would have sold for, unaffected by the railroad, and what it would have sold for as affected by it.  Nor was the advantage of this rule in any degree taken from him by the rejection of the evidence which he offered. His attempted mode of proof of the difference between the two values was entirely inadmissible, and hence was the reason for

the rejection of the evidence. His offers all had the same fault. They proposed to submit to the jury the conjecture of the witnesses as to what the plaintiff's lands would be worth at some unknown future time, when the railroad shall have been constructed. Such testimony does not rise even to the standard of an opinion. It is a mere guess, with no substantial foundation upon which to rest. . . . An estimate of what property will be worth at a future day, or in an altered condition, is entirely without guide or measure, and must be wholly fanciful." In Hornstein v. Atlantic and Great Western R. R. Co., 51 Pa. 87, decided in 1865, we said : " If judicial authority can fix any rule the series of adjudged cases from Schuylkill Nav. Co. v. Thoburn, 7 S. & R. 411, down to Harvey's Case, 47 Pa. 434, has established the measure of damages for building a railroad through a man's land to be the difference betwixt the value of the land before the road was built and its value after the road is finished. In estimating the disadvantages resulting from the road, consequential or speculative damages are to be rejected." In Shenango & Allegheny R. R. Co. v. Braham, 79 Pa. 447, decided in 1875, we said: " In one of the early cases upon this subject (Schuylkill Nav. Co. v. Thoburn, 7 S. & R. 411) it was held by this Court that the jury should consider the matter just as if they were called upon to value the injury at the moment when compensation could first be demanded; they are to value the injury to the property without reference to the person of the owner, or the actual state of his business, and in doing that the only safe rule is to inquire what the property unaffected by the obstruction would have sold for at the time the injury was committed. What would it have sold for as affected by the injury? The difference is the measure of the compensation. This rule has been followed in Penna. R. Co. v. Heister, 8 Pa. 450," and a large number of other cases, citing them. "In none of these cases is there any authority for the doctrine that the value of the land is to be limited to, or measured by, a particular use." In Railroad Co. v. Patterson, 107 Pa. 461, we said : " But the court was certainly correct in saying that the jury could not take into consideration any supposed loss to the plaintiff of profits in his business. Such an assessment would be merely speculative, and a rule which justified it would lead to most ruinous results." In Railway Co. v. Mc-

Closkey, 110 Pa. 436, decided in 1885, we said: " In estimating the damages to a landowner, caused by the construction of a railroad, the rule as to the measure of damages, declared by Judge GIBSON in the case of Schuylkill Nav. Co. v. Thoburn, 7 S. & R. 411, has ever since been recognized and followed," stating the rule, " . . . . Merely speculative damages cannot be allowed. . . . The jury cannot include in the verdict a fund to cover the costs of fencing, or to provide an indemnity against losses by fire, or casualties to the cattle and stock upon the farm. Such an assessment must necessarily be purely speculative, as the matters thus sought to be provided against are in their nature altogether ideal and fanciful. . . . The estimate of a merely prospective injury can be founded in no rational or correct legal principle, and cannot therefore be allowed." In Penn. S. V. R. Co. v. Cleary, 125 Pa. 442, there is a good illustration of the application of the rule to those subjects which are proper, and those which are improper to be considered by the jury: " The true measure of the damages sustained by any given lot of land is found in the difference between its selling value before and after the injury complained of. It is proper to consider for what purpose it may be used to advantage, in order to determine for what price it will sell. It may be salable as a site for the erection of a hotel, a factory, a dwelling, or a wharf, but it is not proper to lay before the jury proof of what the hotel or other structure would cost, together with proof of the value of the lot with such structure upon it, and treat the difference between these sums as the value of the lot. Such a method would be speculative and fanciful. Equally improper is evidence showing how many building lots the tract under consideration could be divided into, and what such lots would be worth separately. It is proper to inquire what the tract is worth, having in view the purposes for which it is best adapted, but it is the tract and not the lots into which it may be divided, that is to be valued. . . . The jury are to value the tract of land and that only. They are not to determine how it could best be divided into building lots, nor conjecture how fast they could be sold, nor at what price per lot. . . . They (the jury) are not to inquire what a speculator might be able to realize out of a resale in the future, but what a present purchaser would be willing to pay for it in the condition it is now in."

In Schuylkill, etc., R. R. Co. v. Stocker, 128 Pa. 233, we said: "The proper and legitimate inquiry in all these cases is, what was the actual market or selling value of the property, just as it was immediately before the land was taken for the railroad, and what was its same value after the completion of the road? Of course the possible uses of the ground may be considered and estimated by the witness in forming his opinion, but it would be highly dangerous to permit verdicts to be founded upon a consideration of future speculative operations which may never transpire, and whose results, whether profitable or otherwise, cannot be known in advance."

.When this case was here before, 182 Pa. 362, we said: "But in a mere legal sense, and that is the way we are obliged to view it, the radical and fatal vice of the contention we are now considering is, that it is entirely too remote, altogether imaginary and purely speculative to the last degree. All the elements of certainty in deductions are absent. They exist only in the future and therefore cannot be known, they depend upon variable and uncertain conditions and they cannot possibly form the basis of a sound and reliable judgment." These authorities might be multiplied, but it is not necessary. We are clearly of opinion that all the assignments of error must be sustained.

Judgment reversed and new venire awarded.