903 A.2d 1192

In re DE FACTO CONDEMNATION AND TAKING OF LANDS OF WBF ASSOCIATES, L.P. BY LEHIGH–NORTHAMPTON AIRPORT AUTHORITY.

C. Thomas Fuller, Intervenor.

Appeal of Lehigh–Northampton Airport Authority.

In re De Facto Condemnation and Taking of Lands of WBF Associates, L.P. by Lehigh–Northampton Airport Authority.

C. Thomas Fuller, Intervenor.

Appeal of WBF Associates, L.P.

In re De Facto Condemnation and Taking of Lands of WBF Associates, L.P. by Lehigh–Northampton Airport Authority.

Appeal of C. Thomas Fuller, Intervenor.

Supreme Court of Pennsylvania.

Argued March 8, 2005.

Decided Aug. 22, 2006.

Carl Robert Shultz, Washington, DC, Charles James Fonzone, Allentown, Michael D. Klein, Pittsburgh, Frances Ann

Fruhwirth, Allentown, for Lehigh–Northampton Airport Authority.

Kevin T. Fogerty, Allentown, for WBF Associates, L.P.

Michael Scott Hino, Berwyn, for C. Thomas Fuller.

BEFORE: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Justice NEWMAN.

In these cross appeals, the Lehigh–Northampton Airport Authority (Airport Authority), appeals from an Order of the Commonwealth Court affirming in part and reversing in part an Order of the Lehigh County Court of Common Pleas (trial court). WBF Associates, L.P. (WBF) appeals from the same Order of the Commonwealth Court. C. Thomas Fuller (Fuller) cross-appeals in both instances. The subject of these appeals is the *de facto* taking of 632 acres belonging to WBF due to the projected expansion of the Lehigh Valley International Airport (Airport). We granted allowance of appeal to consider the damages issues raised by the parties and to examine, once again, the law of the case doctrine and the coordinate jurisdiction rule. Based on the following rationale, we affirm in part and reverse in part the Order of the Commonwealth Court.

## FACTS & PROCEDURAL HISTORY

On September 27, 1990, WBF purchased a 632–acre tract of undeveloped farmland from Fuller that was located just north of the Airport. Fuller held a significant first mortgage on the property in the amount of $3,075,850.00 and later granted WBF a $300,000.00 line of credit secured by a second mortgage. WBF planned to build a planned residential development (PRD) of 1,488 residential units. Before taking title, WBF entered into a joint venture agreement with Lanid Corporation (Lanid), a New Jersey developer that had successfully constructed twelve planned residential communities

at other locations. Lanid was to supply seed money and $250,000.00, at the time it entered the joint venture. WBF was obligated to raise $1,700,000.00, and then, if Lanid chose to continue the joint venture after five years, Lanid was obligated to supply approximately $1,700,000.00. By early 1994, WBF and Lanid obtained zoning changes and approvals from two of the three townships in which the property is located, and WBF spent considerable sums on development costs including retaining architects, engineers, and designers for the project.

In January of 1994, the Airport Authority publicly announced the proposed expansion of the Airport, which involved acquiring approximately 1,500 acres located north of the Airport. The 1,500 acres included the property of WBF in its entirety. Following the announcement and attendant publicity, the Airport Authority began acquiring properties within the 1,500–acre expansion area. These acquisitions also received considerable publicity. It did not seek to acquire the WBF property, but did acquire nine properties immediately adjoining the WBF property. Because of the announcement and the acquisition of properties by the Airport Authority, Lanid terminated its joint venture agreement with WBF prior to its required infusion of funds, and WBF was unable to attract new investors due to the imminent condemnation of its property. WBF, which had been financially sound prior to the announced airport expansion, could not move forward with its development project due to lack of funding. WBF subsequently defaulted on its first and second mortgages. The mortgagee, Fuller, filed a successful foreclosure action in June of 1997. In September of 1997, the property was listed for upset tax sale, but WBF was able to pay the 1995 taxes to avert the sale.

On September 30, 1996, WBF filed a Petition for Appointment of a Board of Viewers alleging a *de facto* taking of its property as a result of the Airport Authority's announced expansion project, and the Airport Authority filed Preliminary Objections. In lieu of a hearing, the parties submitted record papers, depositions, affidavits, discovery responses, exhibits,

and agreements of counsel at oral argument. On June 15, 1998, the trial court dismissed the Preliminary Objections and granted the Petition of WBF for Appointment of a Board of Viewers. The trial judge, James Knoll Gardner, President Judge (Judge Gardner), determined that: (a) a PRD constituted the highest and best use of the property; (b) WBF had established the elements of a *de facto* taking; and (c) the date of the taking was September 30, 1996, the date on which WBF filed its Petition for Appointment of a Board of Viewers. (*Trial Court I* )

The Commonwealth Court affirmed in a published Opinion. *Lehigh–Northampton Airport Auth. v. WBF Assocs.*, 728 A.2d 981 (Pa.Cmwlth.1999). As of the time of the Commonwealth Court's Opinion, WBF had not paid the 1996 and 1997 taxes on the property and had no funds with which to do so. This Court denied allowance of appeal on November 3, 1999. *In re De Facto Condemnation & Taking of Lands of WBF Assocs., Lehigh–Northampton Airport Auth.*, 560 Pa. 751, 747 A.2d 372 (1999) (unpublished table decision).

On December 2, 1999, Fuller filed a Petition to Intervene in the proceedings in order to protect his interest as mortgagee. WBF filed a motion to compel payment of estimated just compensation (EJC) and, by letter dated December 22, 1999, the Airport Authority made a written offer to pay EJC in the amount of $3,150,000.00 on January 4, 2000.

In May of 2000, anticipating the scheduled view of the property by the board of viewers, Fuller filed: (a) a Motion to stay proceedings before the board of viewers pending a determination on the Motion to Intervene; and (b) a Motion for an order requiring the Airport Authority to pay the EJC to Fuller as holder of the first mortgage and the second mortgage judgment on the property. In an effort to settle this dispute, WBF and Fuller executed a Stipulation detailing the history, terms, and money due to each entity pursuant to the two mortgages between those two parties. The Airport Authority executed and signed an addendum to the Stipulation indicating that it did not object to the terms of the Stipulation.

The Airport Authority then tendered a check to Fuller on November 2, 2000, for the full EJC payment of $3,150,000.00.

Prior to the hearings conducted by the board of viewers, the Airport Authority sent notices to the three individuals who had testified on the issue of the highest and best use of the property in the earlier *de facto* taking proceedings. The Airport Authority intended to re-depose these individuals on the highest and best use for the purpose of establishing the fair market value of the property. WBF filed for a protective order, alleging that the decision of Judge Gardner constituted the "law of the case" on the issue of the highest and best use of the property. Judge Gardner granted the protective order. Thereafter, the board of viewers conducted its hearings in August of 2001, and the Airport Authority restricted its appraisal testimony to the value of the property as a PRD.

In a supplemental proceeding, WBF sought recovery of mortgage interest and delay damages, pursuant to Sections 609 and 611 of the Eminent Domain Code, 26 P.S. §§ 1–609, 1–611. The board of viewers awarded WBF damages for the value of the property, mortgage interest, and delay damages. All three parties appealed to the trial court, requesting preliminary determinations. Due to the unavailability of Judge Gardner, Judge Carol McGinley (Judge McGinley) heard the matter.

Judge McGinley determined that: (a) the Airport Authority could present evidence at trial regarding the highest and best use of the property; (b) the Airport Authority was precluded from challenging the validity of the WBF/Fuller mortgages; (c) WBF was entitled to recover mortgage interest from September 30, 1996; (d) WBF was entitled to delay damages from September 30, 1996; (e) the Airport Authority must receive credit for payment of the EJC from November 2, 2000; and (f) WBF was entitled to recover reasonable attorney, appraisal, and engineering fees. All parties appealed.

The Commonwealth Court, in a published Opinion, *In re De Facto Condemnation*, 845 A.2d 967 (Pa.Cmwlth.), *petition for allowance of appeal granted*, 580 Pa. 708, 860 A.2d 491 (2004),

affirmed in part and reversed in part. It concluded that it did not violate the "law of the case" doctrine or the coordinate jurisdiction rule for Judge McGinley to permit testimony from the Airport Authority on the highest and best use of the property during the final hearings, even though Judge Gardner had ruled differently. It opined that evidence of the highest and best use was relative to the issue of fair market value and, therefore, admissible in the damages phase. The court agreed that mortgage interest, damages, and delay damages were to be calculated from September 30, 1996. Finally, the court disagreed with the Airport Authority, which argued that it should receive credit for EJC from the date it offered to pay the EJC, December 22, 1999, instead of November 2, 2000, the date on which it actually paid the EJC. Judge Simpson offered a Concurring Opinion, commending the trial judges for their professionalism and offering comments on the parameters of preliminary determinations. Again, all parties appealed.

## DISCUSSION [1]

The Airport Authority concedes that WBF is entitled to delay damages pursuant to Section 611, 26 P.S. § 1–611,[2]

1. Our review in an appeal from an eminent domain proceeding is limited to determining whether the trial court abused its discretion or committed an error of law or whether the findings of fact were supported by substantial evidence. *In re Condemnation for State Route 79*, 568 Pa. 546, 798 A.2d 725, 730 n. 4 (2002).

2. Section 611, 26 P.S. § 1–611 states:

The condemnee shall not be entitled to compensation for delay in payment during the period he remains in possession after the condemnation, nor during such period shall a condemnor be entitled to rent or other charges for use and occupancy of the condemned property by the condemnee. Compensation for delay in payment shall, however, be paid at the rate of six per cent per annum from the date of relinquishment of possession of the condemned property by the condemnee, or if the condemnation is such that possession is not required to effectuate it, then delay compensation shall be paid from the date of condemnation: Provided, however, That no compensation for delay shall be payable with respect to funds paid on account, or by deposit in court, after the date of such payment or deposit. Compensation for delay shall not be included by the viewers or the court or jury on appeal as part of the award or verdict, but shall at the time of payment of the award or judgment be calculated as above

but contends that WBF is not entitled to delay damages from the date of the *de facto* condemnation because the Airport Authority did not take physical possession of the condemned property and the *de facto* condemnation did not disrupt the "full and normal" use of the property. The Airport Authority contends that a determination of the date on which the accrual of delay damages commences should follow a determination by the trial court as to (a) what constitutes the "full and normal" use of the condemned property and (b) when the condemnee lost the "full and normal" use of that property.

The Airport Authority asserts that the holding of the Commonwealth Court that delay damages always begin on the date of the *de facto* condemnation conflicts with other decisions of that court, *see, e.g., In re Condemnation by Urban Redevelopment Authority*, 70 Pa.Cmwlth. 230, 452 A.2d 1113 (1982), and unspecified decisions of this Court. It also asserts that, while purporting to rely on *Hughes v. Department of Transportation*, 514 Pa. 300, 523 A.2d 747 (1987), the Commonwealth Court departed from precedent established by this Court that "where a declaration of taking deprives a landowner of the full and normal use of his property, as established by the use to which his property was devoted prior to the declaration, then that landowner shall no longer be considered 'in possession' within the meaning of Section 611, and the condemnee may claim delay damages from the date of the declaration of taking." *Id.* at 752 (emphasis omitted). The Airport Authority maintains that, although *Trial Court I* established that the highest and best use of the property was for a PRD, the actual use of the property was agricultural, and there has been no finding that it prevented the property from being used for its "full and normal" use as agricultural land.

Essentially, WBF argues that the Airport Authority should not be able to relitigate the date of taking issue. It points out that this date as well as the determination of highest and best use was litigated before Judge Gardner and became a final

and added thereto. There shall be no further or additional payment of interest on the award or verdict.

26 P.S. § 1–611 (emphasis supplied).

determination when this Court denied allowance of appeal. It contends that the Commonwealth Court properly followed its decision in *McGaffic v. Redevelopment Authority*, 732 A.2d 663, 671 (Pa.Cmwlth.), *allowance of appeal denied*, 560 Pa. 733, 745 A.2d 1226 (1999), *allowance of appeal denied*, 561 Pa. 663, 747 A.2d 903 (1999) (*McGaffic II* ).

### I. Commencement of Delay Compensation

■ The Pennsylvania Constitution provides that private property cannot be taken for public use without just compensation. Pa. Const. Art. I, Section 10. This Court has held that a *de facto* taking occurs when an entity clothed with the power of eminent domain substantially deprives an owner of the beneficial use and enjoyment of his property. *Conroy–Prugh Glass Co. v. Dep't of Transp.*, 456 Pa. 384, 321 A.2d 598, 599 (1974). Upon that occurrence, three basic types of damages may be available to the property owner when her land is taken for public use. Upon appropriation, she acquires an immediate right to the fair market value of the land. *Phila. Ball Club Ltd. v. City of Phila.*, 192 Pa. 632, 44 A. 265 (1899). This claim, however, does not ripen into a debt until the amount has been definitely ascertained, either by agreement between the parties or by judicial determination. *Whitcomb v. City of Phila.*, 264 Pa. 277, 107 A. 765 (1919). When the amount of the claim is finally determined, it relates back to the time of the taking.[3] *Id.*

■ The property owner may also be entitled to recover damages, traditionally called detention damages, from the date of the taking of the property to the date of the award as compensation for the detention of the landowner's money. *See, e.g., Wolf v. Commonwealth*, 403 Pa. 499, 170 A.2d 557 (1961). Finally, the property owner may receive interest from the date of the award to the date of payment. Compensation for delay in payment was made a matter of right pursuant to

3. *See Pa. R. Co. v. Cooper*, 58 Pa. 408 (1868) (holding that "It can hardly be made a question that the plaintiff below was entitled to recover interest upon the value of his property taken by the company defendants and appropriated for the purposes of their road, from the time that it was taken.").

Section 611 of the revised Eminent Domain Code enacted in 1964. Act of June 22, 1964, P.L. 84, art. VI, § 611, 26 P.S. § 1-611. Detention damages plus interest from the date of the award have been lumped together by custom and become known as delay damages. Thus, delay damages begin to accrue from the taking of the property, with few exceptions.[4] This fundamental principle arises because a property owner is not fully compensated for her loss unless she receives, not only the value of her property, but receives it as nearly as may be to the date of the loss. *Wolf,* 170 A.2d 557.

The threshold issue before us is what constitutes the date of taking for purposes of computing delay damages. This date has been variously held to occur upon the adoption of a condemnation resolution or ordinance by the body authorized to appropriate private property for public use, upon filing the plans as authorized by law, upon filing the bond to secure payment of the compensation, or not until actual entry upon the land. *Lakewood Mem'l Gardens,* 381 Pa. 46, 112 A.2d 135 (1955); *Rosenblatt v. Pa. Tpk. Comm'n,* 398 Pa. 111, 157 A.2d 182 (1959).

■ Where the property owner remains in possession after the appropriation and continues to receive its benefits, the recovery of detention damages may be limited or even eliminated. However, in some instances, even though the property owner retains possession of the land, she may be subject to restrictions that functionally result in the loss of use because she cannot make improvements, plan for future developments, continue ongoing projects, or enter into leases. Jacob Schiffman and Patrick J. Toole, "Detention Damages in Eminent Domain Proceedings," 68 Dick. L.Rev. 55 (Summer 1964); *accord Conroy–Prugh Glass Co. v. Dep't. of Transp.,* 456 Pa. 384, 321 A.2d 598 (1974).

■ The Airport Authority contends no delay damages are due because WBF had the "full and normal" use of its property, which was agricultural in nature, and is still in its

---

**4.** *See, e.g., Pittsburgh North, Inc. v. Dep't of Transp.,* 514 Pa. 316, 523 A.2d 755 (1987) (refusing delay damages where property was vacant).

possession. It argues that Section 611 denies compensation during the period a condemnee remains in possession and balances that denial by prohibiting the condemnor from assessing monetary amounts for the use and occupancy of the condemned property.

In *Hughes v. Dep't of Transp.*, 514 Pa. 300, 523 A.2d 747 (1987), this Court examined the meaning of the term "possession" within the context of the Eminent Domain Code. The Department of Transportation (Department) filed a declaration of taking for portions of various dairy farms. The owners sold their dairy herds and ceased all dairy operations. The Department argued that delay damages were inappropriate because the dairy farmers retained possession of the property. We concluded that, after a declaration of taking in which the owner maintains some degree of possession, deprivation of the normal use of the property constituted a taking. We stated:

> In that twilight of eminent domain, between present possession in the owner and the future right of possession by the Commonwealth, all the possible ordinary concomitants of possession repose in the actual potential of the land. If the land cannot be put to its ordinary use because of the condemnation, such a result, without adequate compensation, would be an unjust taking and a waste of the uses of land. It follows that when the condemnation deprives the landowner of the normal uses of the land, pending physical possession by the Commonwealth, compensation must also be intended.

*Id.* at 751–52. It is also axiomatic that, when a public entity acting in furtherance of a public project directly and substantially interferes with property rights and, thereby, significantly impairs the value of the property, the result is a taking and compensation must be paid. In *Hughes*, the normal use was dairy farming. We conclude that the normal use of the WBF property in the case *sub judice* was for development of a PRD. All of the activities of WBF since acquiring the property were directed toward the development of a residential community, just as all of the activities conducted in *Hughes* were directed

toward dairy farming. The fact that in both instances possession was retained and the land remained agricultural did not negate a deprivation of its actual "full and normal" use.

*Conroy–Prugh Glass, supra,* is closely analogous to the present matter in that extensive publicity regarding the construction of a parkway resulted in the property owner losing substantial revenues from tenants in its building to the point where it was no longer able to meet operating expenses and faced the loss of the property. The property owner was unable to rent out its property because tenants feared the impending condemnation. The property owner petitioned for the appointment of a board of viewers pursuant to Section 502(e), 26 P.S. § 1–502(e), even though the Commonwealth filed no formal declaration of taking. This Court reasoned that, because the publicity generated by the Commonwealth had deprived the property owner of substantially all of the use of his property, a *de facto* condemnation had occurred. Here, the Airport Authority made a public announcement of its expansion plans, and the property needed for the expansion clearly included the property of WBF. As a result of the announcement, WBF lost a funding partner in its development project, was unable to find alternate investors to fund the project, and ultimately faced the loss of the property due to its inability to develop it. This is the same scenario presented in *Conroy–Prugh Glass* where we found that a *de facto* taking had occurred and that to hold otherwise would deprive a property owner of her property without due process of law. *Conroy–Prugh Glass,* 321 A.2d at 602.

The Airport Authority has asked us to examine whether a condemnee's entitlement to delay damages, pursuant to Section 611 of the Eminent Domain Code, can start on a date *after* the date of the *de facto* taking. We have answered that question in the affirmative when the facts of the case have warranted it.[5] However, in *Hughes,* we specifically stated that, once a property owner has been deprived of the "full and normal use" of the property, the property owner is entitled to

---

5. *See, e.g., Pittsburgh North, Inc v. Dep't of Transp.,* 514 Pa. 316, 523 A.2d 755 (1987).

delay damages from the date of taking. Further, the case *sub judice* is on all fours with the decision of this Court in *Conroy–Prugh Glass,* and WBF is entitled to delay damages from the date of the taking. The date of the taking that has been established by the trial court in this instance is the date upon which WBF filed its Petition for a Board of Viewers, September 30, 1996.[6] Therefore, the Airport Authority failed to show that WBF continued to have full and normal use of the condemned property as established by the use to which it was devoted prior to the declaration, and we hold that the Commonwealth Court correctly determined that WBF is entitled to delay damages from the date of filing of the Petition for a Board of Viewers.

## II. Mortgage Interest Accrual[7]

■ WBF challenges the determination of the Commonwealth Court that its right to mortgage interest stopped accruing when the Airport Authority tendered its payment of EJC in November of 2000.[8] WBF maintains that this is inconsistent with other Commonwealth Court opinions, partic-

6. WBF does not challenge the conclusion that the date of its Petition for a Board of Viewers controls the date of the taking. However, previous authority of this Court has defined the taking as the date when the governmental entity makes it known that it intends to acquire property pursuant to its power of eminent domain. *Lakewood Mem'l Gardens,* 112 A.2d at 138–39. In this instance, that could have occurred as early as January of 1994, when the Airport Authority publicly announced the Airport expansion. Because WBF does not challenge the established taking date, we will accept the conclusion of the Commonwealth Court that September 30, 1996, the date of the Petition seeking appointment of a board of viewers, constitutes the date of taking for purposes of this Opinion.

7. We are only concerned here with mortgage interest as an expense to the property owner, which has been incurred because the Airport Authority failed to declare a taking. Although the obligation to make mortgage payments continued during these years, only the portion of the mortgage payment that represents mortgage interest is eligible for reimbursement as a cost or expense actually incurred.

8. The Airport Authority paid $3,150,000.00 of EJC in November of 2000 to Fuller. WBF asserts that the property is worth about $17 million, and notes that the outstanding balances on the Fuller mortgages in November of 2000 totaled over $8.5 million. It maintains that interest has been accruing after November 2, 2000, at the rate of $1,462.81 per day.

ularly *Gross v. City of Pittsburgh*, 741 A.2d 234 (Pa.Cmwlth. 1999), *aff'd per curiam after remand*, 569 Pa. 711, 805 A.2d 527 (2002). In *Gross*, the Commonwealth Court determined that, where "the condemnee has ownership expenses that it would not have paid absent the condemnor's refusal to acknowledge a taking, the condemnee is entitled to recover those expenses." *Gross*, 741 A.2d at 242. Among the ownership expenses permitted reimbursement by the Commonwealth Court were mortgage interest and property insurance premiums. Accordingly, the Commonwealth Court reversed the disallowance of these ownership expenses and remanded the matter to the trial court for a determination of damages. This Court denied allowance of appeal. *Gross v. City of Pittsburgh*, 563 Pa. 632, 758 A.2d 664 (Table) (2000). Following damage calculation, the matter was again appealed to the Commonwealth Court, which affirmed the decision of the trial court in an unpublished Opinion. *Gross v. City of Pittsburgh*, 769 A.2d 1256 (Pa.Cmwlth.2001) (table). This Court granted allowance of appeal and affirmed the decision of the Commonwealth Court by *per curiam* Order. *Gross v. City of Pittsburgh*, 574 Pa. 1, 828 A.2d 1007 (2003) (Lamb, J. concurring).

Significantly, in *Gross*, the Commonwealth Court ruled that the condemnee in a *de facto* taking case is entitled to be reimbursed for all mortgage interest paid "during the condemnation proceedings." *Id.* at 242.[9] WBF complains that the

---

9. In his Concurring and Dissenting Opinion, Mr. Justice Saylor relies on a decision from the Missouri Court of Appeals which states that "[n]o court has ever held that mortgage interest, much less interest on a loan to secure cash to lend to others, falls within the category of attorney's fees, costs, or other reasonable expenses and losses." *Post* 588 Pa. at 283, 903 A.2d at 1216 (concurring and dissenting opinion) (quoting *66, Inc. v. Crestwood Commons Redevelopment Corp.*, 130 S.W.3d 573, 589 (Mo.App.2003)). In *66, Inc.*, however, the property was subject to a private declaration of condemnation that was subsequently abandoned. The owner of the property retained it throughout the proceedings, was able to operate the business thereon profitably, and sold the property for its appraised value. Damages were subject to statutory reimbursement similar to that provided in Section 408 of the Pennsylvania Eminent Domain Code, 26 P.S. § 1–408, where a declaration of taking is filed, and which limits recovery to the following:

> Where condemned property is relinquished, the condemnee shall be reimbursed by the condemnor for reasonable appraisal, attorney and

plain language of Section 609 does not support the limited and restrictive interpretation of the Commonwealth Court.[10] We agree.

The Airport Authority responds that Fuller and WBF entered into the first loan for the purchase price six years before the *de facto* condemnation and the second loan two years prior. It asserts that the second loan was related to development expenses and that the principal and interest from neither loan are related to, or exist because of, the *de facto* condemnation. The Airport Authority is thus asserting that, because the mortgages on the property did not result from the *de facto* taking, the responsibility for interest payments occasioned by those mortgages is not a proper item of damages. This argument embodies the antithesis of just compensation.

■ A property owner is entitled to just compensation for his or her property at the time it is being taken for public use. Just compensation is constitutionally required and grounded

engineering fees and other *costs and expenses actually incurred because of the condemnation proceedings.*

26 P.S. § 1–408 (emphasis added). In contrast, where there has been a *de facto* taking, Section 609 permits recovery for all costs and expenses "actually incurred" and does not limit costs and expenses to those "actually incurred because of the condemnation proceedings." *See, infra* n. 10. Mr. Justice Saylor indicates that he "read[s] the statute as addressed to litigation expenses which are specially incurred by a condemnee who is forced to invoke the judicial process, and not to distinct holding and/or carrying costs associated with property ownership." *Post* 588 Pa. at 282, 903 A.2d at 1216. However, statutory sections must be interpreted within the entire statutory scheme. While Section 408 limits costs and expenses to those "actually incurred because of the condemnation proceedings," Section 609 does not do so. Further, had the General Assembly intended identical reimbursement provisions for *de facto* and *de jure* condemnation costs and expenses, it certainly knew how to word the text of the statute to accomplish that. The fact that the General Assembly did not use the same language in Section 609 militates against the interpretation preferred by my colleague and is added support for the result we reach today.

10. Section 609, 26 P.S. § 1–609, states:

Condemnee's Costs Where No Declaration of Taking Filed.
Where proceedings are instituted by a condemnee under section 502(e) [related to a *de facto* taking], a judgment awarding compensation to the condemnee for the taking of property shall include reimbursement of reasonable appraisal, attorney and engineering fees and other costs and expenses actually incurred.

in fundamental concepts of fairness. Therefore, when private property is taken for public purpose, the intent of the Eminent Domain Code is to place the dispossessed property owner in the same position after the taking is concluded as existed prior to the condemnation. Generally, when property is condemned in a *de jure* condemnation, fair market value is the measure of damages, with provision for reimbursement of expenses associated with the proceedings. *See* Section 408 of the Eminent Domain Code, 26 P.S. § 1–408. There is no need to reimburse the property owner for mortgage interest because title passes fairly rapidly and any mortgage can be satisfied with the proceeds.

In a *de facto* condemnation, the property is treated as though it has been condemned, but there has been no official condemnation. Although the usual measure of just compensation is the fair market value of the property taken, the actual damages awarded pursuant to Section 609 should be sufficient to make the owner whole but not result in a windfall.[11]

11. Mr. Justice Eakin expresses concern that the "proceeds [of a mortgage] may be used for any purpose at all, not just the acquisition or improvement of the property encumbered." *Post* 588 Pa. at 286, 903 A.2d at 1218 (Concurring and Dissenting Opinion, Eakin, J.). Although some individuals will attempt to take advantage of a condemnation, the fact remains that the owner is unable to dispose of the property while under the threat of condemnation and is forced to continue mortgage payments that would otherwise terminate had the condemnation been declared by the condemning authority and just compensation tendered. In the majority of instances, the mortgage lien will predate the threat or occurrence of condemnation. In those instances where a mortgage is obtained after a *de facto* condemnation arises, such as where the property owner must secure a mortgage rather than lose the property to a tax sale or otherwise, the purpose for the mortgage can be scrutinized. Such was the situation in *66, Inc.*, cited by Mr. Justice Saylor in his Concurring and Dissenting Opinion.

In *66, Inc.*, eight months after the condemnation was announced, the property owner mortgaged the property, paying off a prior mortgage and loaning the excess funds to a business associate to acquire a chain of movie theaters in two distant cities. While the Missouri court affirmed an award of delay damages, it disallowed the mortgage interest expense specifically because the funds were used for purposes not associated with the property or the condemnation.

WBF demonstrated that the first and second mortgages on its property were legitimate in the first phase of this litigation heard by Judge James Knoll Gardner. Also, the mortgage holder (Fuller) has been a

■ In a *de facto* condemnation, however, a considerable party or an intervenor throughout the litigation. In the factual recitation we note:

> On September 27, 1990, WBF purchased a 632–acre tract of undeveloped farmland from Fuller that was located just north of the Airport. Fuller held a significant first mortgage on the property in the amount of $3,075,850.00 and later granted WBF a $300,000.00 line of credit secured by a second mortgage.

*Infra*, 588 Pa. at 248, 903 A.2d at 1195. The trial court determined that the mortgages were legitimate when it granted the following Motions by Fuller:

> In May of 2000, anticipating the scheduled view of the property by the board of viewers, Fuller filed: (a) a Motion to stay proceedings before the board of viewers pending a determination on the Motion to Intervene; and (b) a Motion for an order requiring the Airport Authority to pay the EJC to Fuller as holder of the first mortgage and the second mortgage judgment on the property.

*Infra*, 588 Pa. at 250, 903 A.2d at 1196. Also, the Airport Authority agreed to a stipulation as to the mortgages from Fuller to WBF and, in fact, paid Fuller as the mortgage holder, the estimated just compensation.

> In an effort to settle this dispute, WBF and Fuller executed a Stipulation detailing the history, terms, and money due to each entity pursuant to the two mortgages between those two parties. The Airport Authority executed and signed an addendum to the Stipulation indicating that it did not object to the terms of the Stipulation. The Airport Authority then tendered a check to Fuller on November 2, 2000, for the full EJC payment of $3,150,000.00.

*Id.*

Further, there is no double recovery here. WBF is entitled to detention damages for the loss of its right to receive and use the proceeds from the taking of the property. This is the measure by which a landowner's damages are determined when a landowner, who has retained ownership and possession of the property, has nevertheless been deprived of the full and free use of that property. It is only *because* the ability to repay mortgage interest is affected by the taking that mortgage interest may become part of the "other costs and expenses actually incurred." The mortgage interest is an ownership expense that would have been extinguished if the condemnation had been declared and just compensation paid. When the property owner receives the fair market value of the property, the amount of the mortgage lien is included in that fair market value. Mortgage interest, however, is **not** a component of fair market value. Neither is it paid to the mortgagor nor does it increase or decrease the fair market value of the property. Failure to compensate the property owner for mortgage interest diminishes the total compensation received.

Mr. Justice Saylor posits that "the General Assembly separately provided for delay compensation in Section 611 of the Code, 26 P.S. § 1–611," which he "believe[s] substantially overlaps with holding and/or carrying costs." *Post*, 588 Pa. at 283, 903 A.2d at 1216. As previously indicated in Part I, delay compensation is awarded in a *de facto* condemnation to compensate the property owner for the loss of use of the funds, not as a reimbursement of expenses.

period of time can pass before the landowner initiates condemnation proceedings and resolution is reached. Section 609 of the Eminent Domain Code anticipates this occurrence and authorizes additional compensation for the property owner beyond that contemplated in Section 408. *See R & J Holding v. Redevelopment Authority*, 885 A.2d 643 (Pa.Cmwlth.2005) (holding that Section 408 does not require that a condemnee be made whole); *In re Condemnation, Route 1021*, 709 A.2d 939 (Pa.Cmwlth.1998) (condemnee entitled to only costs and expenses related to condemnation pursuant to Section 408 rather than general damages under Section 609). Thus, where a condemnee has ownership expenses (e.g. mortgage interest, property taxes, insurance premiums, etc.) as an item of general damages that it would not have incurred absent the condemnor's refusal to acknowledge the taking, the condemnee is statutorily entitled to recover those expenses.[12] *See also Reichs Ford Road Joint Venture v. State Roads Commission*, 388 Md. 500, 880 A.2d 307 (2005) (holding that property owner was entitled to seek compensation for lost rental income, mortgage interest, insurance and other types of general damages incurred as a result of the inverse condemnation);[13]

**12.** Mr. Justice Eakin opines that "[m]ortgage interest is not 'other costs and expenses actually incurred' because interest on the mortgage would have accrued regardless of the condemnation." This is simply not the case. Had the Authority proceeded with a *de jure* condemnation in 1994, the parties would have negotiated a price for the land, the Authority would have tendered payment, and WBF would have paid off the mortgages with the proceeds. Then WBF would be free to take the remaining funds and pursue other ventures. Because the Authority did not proceed properly, WBF has been obligated to pay mortgage interest from 1994 to present that it would not have incurred had the condemnation been a *de jure* one rather than a *de facto* one. Further, there is no way other than Section 609 for WBF to recoup this unwarranted expense because mortgage interest does not increase the fair market value.

**13.** In *Reichs Ford*, the Roads Commission issued a public statement revealing that it intended to create a new expressway interchange that would result in the taking of a portion of the subject land. Thirteen years later, when no formal condemnation proceedings had been instituted, the property owner filed a complaint alleging an inverse condemnation. The property owner sought damages for lost rental income, real estate taxes, mortgage interest, fire insurance, and other administrative expenses. The Maryland Supreme Court held that these particu-

*see generally Champs Convenience Stores, Inc. v. United Chemical Co.,* 329 N.C. 446, 406 S.E.2d 856 (1991) (finding that, while no North Carolina case holds that a property owner is entitled to recover as damages reasonable overhead expenses such as rent and mortgage interest, there is no North Carolina case that holds that a property owner cannot recover this type of damages); *L & S Constr. Co. v. Bradbury Homes, Inc.,* 208 Md. 476, 118 A.2d 681 (1955) (concluding that mortgage interest was an allowable cost as part of damages calculation); *United States v. Property Located in Borough of Manhattan,* 225 F.Supp. 498 (S.D.N.Y.1964).

▋ Although the Airport Authority concedes that interest on both loans continues to accrue, it contends that both mortgages ceased to exist as encumbrances upon the property, but merely continue as liens against the condemnation proceeds. *See Briegel v. Briegel,* 307 Pa. 93, 160 A. 581, 583 (1931). In *Briegel,* property belonging to the husband was condemned. The wife sued to protect and enforce a dower interest in that property. This Court concluded that the wife no longer had an interest in the condemned property but retained a possible interest in the proceeds. There we said:

> The theory of eminent domain comes from the absolute right of the sovereign to take property for public use. All title interests must be included in the taking. It would be unthinkable that outstanding interests or rights in the land should remain in others after condemnation; to permit such interests to remain would materially interfere with the completion of the purposes for which the government, or those acting for it or in its right, have taken the property through eminent domain. It is therefore a matter of public policy that condemnation operates against all interests directly connected with the title of land, including all unrecorded equities or hidden interests indirectly connected with or growing out of such titles.

*Id.* at 582. Hence, when the sovereign affects the relationship between the mortgagor and the mortgagee by means of

lar types of damages, which were incurred as a result of the condemnor's pre-condemnation conduct, were compensable.

condemnation proceedings, the law substitutes the condemnation award for the security previously provided by the mortgage.

The award in a condemnation proceeding stands in the place of the land taken, once it is made. Prior to the *de facto* condemnation of its land, the mortgage constituted a lien on the land owned by WBF. However, neither a mortgagor nor a mortgagee has the power to prevent the taking of property for a public purpose by an entity clothed with the power of eminent domain. When the property that is a subject of condemnation is taken from the owner, title vests in the condemning entity free and clear of the mortgage lien. The mortgagee, although losing its mortgage lien upon the condemned property, retains an equitable lien as security for the debt upon the damage award for the land that was taken in the condemnation proceeding. The award stands in place of and as a substitute for the land that was taken and can be applied to satisfy the debt. However, this does not release the condemnor from providing just compensation to the condemnee. Further, in a *de facto* taking, the property owner retains title to the property because the condemnation has not been declared and title has not transferred to the sovereign.

In the instant matter, both WBF and Fuller have property interests that are affected by the taking. WBF valued the property at $17,000,000.00 and indicated that the outstanding mortgages totaled approximately $9,000,000.00. Section 1–609 of the Eminent Domain Code provides that, "[w]here proceedings are instituted by a condemnee under section 502(e), a judgment awarding compensation to the condemnee for the taking of property shall include reimbursement of ... **other costs and expenses actually incurred.**" 26 P.S. § 1–609 (emphasis supplied). Therefore, WBF is entitled to all mortgage interest from the date of taking to the date of the EJC payment, plus all mortgage interest from the date of EJC payment to the date of the award that it has actually incurred. Obviously, the mortgage principle must be adjusted to reflect the EJC payment to Fuller, which will also result in a payment recalculation. However, we believe that WBF is also

entitled to mortgage interest incurred by it from the date of the award to the date of award payment. The Airport Authority paid EJC of $3.5 million on November 2, 2000, and tendered the money to Fuller as mortgage holder, ostensibly to reduce the principal amount of the mortgage. However, payment of EJC by the Airport Authority did not fairly reflect the value of the property or the amount of existing liens sufficient to relieve it of the obligation to reimburse WBF for mortgage interest continuing after that date as a component of damages. There would have been no need for WBF to pay mortgage interest if the Airport Authority had acknowledged a taking of the WBF property when it publicly announced the airport expansion and began acquiring by condemnation the properties surrounding that of WBF. The failure of the Airport Authority to file for the condemnation required WBF to initiate proceedings pursuant to Section 502(e). During Section 502(e) proceedings, ownership of the property is placed at issue. Pursuant to Section 402, 26 P.S. § 1–402, title passes to the condemnor after a taking, but title remains with the property owner until the court decides whether a taking has occurred in a Section 502(e) proceeding.

While payment of EJC does relieve the Airport Authority from payment of interest on that portion of the property covered by EJC and any corresponding interest obligation covered by the EJC payment, the plain language of Section 609 entitles WBF to the mortgage interest, which it incurred, from the date of EJC payment to the date of the award and, thereafter, to the payment of that award. Section 609 contemplates payment of all costs and expenses actually incurred, rather than only those related to the condemnation proceedings as directed by Section 408, and presumes the entire course of the litigation as its terminal point. The Commonwealth Court clearly erred when it departed from the principles established in *Gross* in concluding that WBF's entitlement to interest ceased on the date that the Airport Authority tendered its EJC, and we reverse the Order of the Commonwealth Court with respect to this portion of its decision.

### III. Order of Second Trial Court Judge

WBF challenges the determination of the Commonwealth Court that Judge McGinley properly overruled the determination of Judge Gardner that the Airport Authority was precluded from relitigating the highest and best use during the damages portion of the case. WBF argues that permitting the Airport Authority to present additional evidence on the highest and best use for the property is contrary to well-established principles of res judicata, collateral estoppel, and the law of the case. It remarks that Judge Gardner based his ruling on a voluminous record, with both parties having a full and fair opportunity to litigate that issue, and that his determination that a PRD constitutes the highest and best use is pivotal to his conclusion that a *de facto* taking occurred. WBF asserts that a final and conclusive finding of the highest and best use by the trial court in a *de facto* taking case should be binding in the damages portion of the litigation involving the same parties and the same property. It notes that this Court has not previously addressed this issue and argues that the view of the Commonwealth Court on this matter is a substantial departure from well-established principles of finality of rulings and findings.

The Airport Authority contends that the highest and best use for a condemned property is part of the fair market value of that property. Because "just compensation" is determined by the difference in fair market value of the property immediately before and after the condemnation, the Airport Authority maintains that it is entitled to present evidence on the actual highest and best use. Before Judge McGinley, the Airport Authority argued that it was error to hold that it was precluded from discovery and presenting evidence on the issue of highest and best use. It counters that Judge McGinley was not bound by the November 3, 2000 Order of Judge Gardner because it was erroneous. It maintains that Judge McGinley correctly determined that evidence on this issue was necessary during the damages phase.

It is well established that judges of coordinate jurisdiction sitting in the same case should not overrule each other's decisions on the same issue. *See Commonwealth v. Starr*, 541 Pa. 564, 664 A.2d 1326 (1995). This rule is premised on sound judicial policy, and departure from the rule is permitted only in exceptional circumstances, such as where there has been an intervening change in the controlling law, where there has been a substantial change in the facts or evidence giving rise to the dispute, or where the prior holding was clearly erroneous and would create manifest injustice if followed. *Id.* at 1332. In *Riccio v. American Republic Insurance Co.*, 550 Pa. 254, 705 A.2d 422, 425 (1997), this Court explained that the coordinate jurisdiction rule falls within the "law of the case" doctrine, which embodies the concept that:

> [A] court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the matter. Among the related but distinct rules which make up the law of the case doctrine are that: (1) upon remand for further proceedings, a trial court may not alter the resolution of a legal question previously decided by the appellate court in the matter; (2) upon a second appeal, an appellate court may not alter the resolution of a legal question previously decided by the same appellate court; and (3) upon transfer of a matter between trial judges of coordinate jurisdiction, the transferee trial court may not alter the resolution of a legal question previously decided by the transferor trial court.

*Starr*, 664 A.2d at 1331. The rule serves "not only to promote the goal of judicial economy" but also: "(1) to protect the settled expectations of the parties; (2) to ensure uniformity of decisions; (3) to maintain consistency during the course of a single case; (4) to effectuate the proper and streamlined administration of justice; and (5) to bring litigation to an end." *Id.* In ascertaining whether the law of the case doctrine applies, this Court looks to the timing of the rulings within the procedural posture of the case. *Riccio,* 705 A.2d at 425.

In a traditional condemnation proceeding, the condemnor files a declaration of taking in the local court of common pleas and identifies one, some, or all of the properties it is condemning. 26 P.S. § 1–402(a),(b). Then, within a year after the project is authorized, the condemnor must appropriately file all declarations of taking for all properties to be condemned for the project. 26 P.S. § 1–402(d). Notice must be served on the condemnee within the thirty-day period following the filing of the declaration of taking. 26 P.S. § 1–405(a). The condemnee must file preliminary objections within thirty days of the notice or waive them. 26 P.S. § 1–406(a). However, preliminary objections at this stage are statutorily limited to four issues: "(1) the power or right of the condemnor to appropriate the condemned property unless the same has been previously adjudicated; (2) the sufficiency of the security; (3) any other procedure followed by the condemnor; or (4) the declaration of taking." *Id.* When the time to file preliminary objections expires, the condemnor is entitled to possession of the property upon tender of EJC, although payment of EJC does not prejudice the parties' ability to proceed to a final determination of damages. 26 P.S. § 1–407(a),(c). If the condemnee challenges the taking and files preliminary objections, a board of viewers is appointed and the board conducts a hearing to determine the highest and best use and the damages incurred by the condemnee. The report and its recommendation may be appealed to a court of common pleas.

■ The scope of review by the court of common pleas is plenary, and the court is not bound by the findings or conclusions of the board of viewers. Witnesses can be changed and other evidence included or excluded by the condemnees as their trial strategy dictates. *See, e.g., Stoner v. Metro. Edison Co.,* 439 Pa. 333, 266 A.2d 718 (1970); *Snyder v. Commonwealth,* 412 Pa. 15, 192 A.2d 650 (1963).

■ In the non-traditional condemnation proceeding, though, no declaration of taking is filed. When a condemnee believes that property has been condemned without just compensation, proceedings commence when the condemnee files a

petition for a board of viewers with the court of common pleas. 26 P.S. § 1–502(e). If the condemnor objects, then it does so by filing preliminary objections with the court of common pleas. Contrary to the traditional condemnation proceeding where preliminary objections must be filed consistent with Section 407, preliminary objections in a *de facto* condemnation case are filed by the condemnor pursuant to Section 504, 26 P.S. § 1–504, which does not contain the limitations present in Section 407. Preliminary objections raised by the condemnee pursuant to the strictures of Section 407 do not permit a challenge or determination of highest and best use. Conversely, when preliminary objections are filed pursuant to Section 504, all issues of objection must be raised, including the highest and best use of the property. This is because the common pleas judge must determine whether the landowner has been deprived of the use of the property, including its highest and best use. When the trial court renders findings prior to the appointment of a board of viewers, the findings are binding on that board, which will hear and decide the remaining damages issues. *See, e.g., Redev. Auth. v. Woodring,* 498 Pa. 180, 445 A.2d 724 (1982). As such, in non-traditional condemnation proceedings, the courts of common pleas, acting *de novo,* serve in a fact-finding capacity rather than in the capacity of an appellate reviewer of the decisions of a board of viewers. This is somewhat analogous to the relationship existing between an unemployment compensation referee and the Unemployment Compensation Board of Review, or an administrative law judge and the Public Utility Commission.

The Airport Authority relies upon the decision of the Commonwealth Court in *In re Condemnation for Legislative Route 1046,* 146 Pa.Cmwlth. 344, 605 A.2d 1286 (1992) (hereinafter *Legislative Route 1046* ), in which the court, on remarkably similar facts, held that the trial court erred in precluding the Department of Transportation (Department) from presenting evidence and argument on the highest and best use based on a prior Order of a trial judge in the case. There, the condemnees acquired property for development purposes

shortly before the Department prepared plans for a Pottstown expressway project. The plans anticipated condemnation of the subject property and, within nine months, the Department had acquired all but eight of the nearly two hundred properties along the proposed expressway. Not until seven years later did the Department file a formal declaration of taking, to which the condemnees filed preliminary objections, asserting that the taking had been a *de facto* one that actually occurred some seven years previously. The parties stipulated that the trial court would determine the issue of a *de facto* taking in another proceeding before the hearing by the board of viewers. Following this hearing, the trial judge held that a *de facto* taking had occurred, identified the highest and best use of the property, and appointed a board of viewers to determine damages. The board of viewers determined that it was bound by the determination of highest and best use articulated by the trial judge. Following an award of delay damages, both parties appealed to the trial court. The Department sought a preliminary determination that the board of viewers was not bound by the finding of the trial judge, seeking to relitigate the highest and best use. The Commonwealth Court held that the board of viewers erred in concluding that it was bound by the highest and best use determination because the "question of damages simply has no relevance when preliminary objections are filed" pursuant to Section 407. *Id.* at 1291.

As previously indicated, when preliminary objections are filed by the condemnees following a declaration of taking, the subject matter is limited to: "(1) the power or right of the condemnor to appropriate the condemned property unless the same has been previously adjudicated; (2) the sufficiency of the security; (3) any other procedure followed by the condemnor; or (4) the declaration of taking." 26 P.S. § 1–406(a). In *Legislative Route 1046,* the parties stipulated that the trial court would address the issue of a *de facto* taking in a separate proceeding before the trial court. The trial court ruled on that issue, including a determination of the highest and best use, which became the law of the case. Pursuant to

traditional condemnation practice, a determination of highest and best use would have been made by the board of viewers and examined by the trial court as the final fact finder. This procedural aberration took the determination out of the realm of the traditional condemnation proceeding and the Section 407 limits did not apply.

In the instant matter, Judge Gardner ruled, as an evidentiary ruling, that the Airport Authority was prohibited from presenting additional testimony from the condemnee's experts in the damages phase, who had already testified by deposition in the initial proceeding, as to the highest and best use of the property. The highest and best use was a determination that was fully litigated by the parties and formed an integral part of Judge Gardner's decision that a *de facto* taking had occurred.[14] Judge Gardner noted that, to succeed in its claim, WBF had to establish that: (1) the Airport Authority is an entity clothed with the power of eminent domain; (2) WBF was substantially deprived of the use of its property; (3) WBF was deprived of the use of its property as a direct result of the actions of the Airport Authority; and (4) WBF's injury was not speculative or conjectural. In determining prong two, Judge Gardner noted that the beneficial use of a property includes not only its present use, but also its

14. In a condemnation proceeding, what constitutes the "highest and best use" of the condemnee's property is generally considered a question of fact or "at least, a mixed question of law and fact." *Post* 588 Pa. at 285, 903 A.2d at 1217 (Concurring and Dissenting Op. Justice Saylor). The "law of the case" doctrine is commonly applied to preclude the relitigation of conclusory legal determinations, but in less common instances, it has been applied to preclude relitigation of both findings of fact and conclusions of law. *See United States v. Monsisvais*, 946 F.2d 114, 115 n. 2 (10th Cir.1991) (recognizing that "[s]ome courts characterize the law of the case doctrine as applying to both findings of fact and conclusions of law"); *Equal Employment Opportunity Comm'n v. Int'l Longshoremen's Assoc.*, 623 F.2d 1054, 1058 (5th Cir.1980) (stating that, pursuant to "law of the case" rule, "trial and appellate courts are bound by any findings of fact or conclusions of law made [in] the case at issue").

 If a jury can reconsider a determination of a trial court that is crucial to its ultimate legal conclusion in a later phase of the same litigation, the possibility exists that an adverse determination can undermine that initial legal conclusion and emasculate the principles underlying the "law of the case" doctrine.

highest and best use, and that a taking occurs where a property owner is deprived of the use of its property. In so finding, Judge Gardner concluded, after noting the testimony that he credited in making this determination, that the highest and best use is as a PRD. The Commonwealth Court affirmed this determination.

 The Preliminary Objections in the instant matter were filed pursuant to Section 504. Within that context, a trial judge must determine the highest and best use of the property, the actions of the condemnor, and whether those actions effected a taking of property to require just compensation. Before the Board of Viewers, the Airport Authority sought to depose the same experts who testified in the initial phase of the proceedings in order to establish the highest and best use for purposes of the board of viewers' assessment of damages. We fail to see how the determination of the highest and best use can differ from that determined within the context of a *de facto* taking and that determined as part of fair market value in two separate but related phases of the same litigation. The highest and best use is the highest and best use. The fact remains that Judge Gardner issued his ruling with regard to the same issue as did Judge McGinley—the highest and best use as a component of fair market value. There was no change in the law or substantial change in the facts to justify the conclusion of Judge McGinley that the determination of Judge Gardner could be set aside, particularly when the Commonwealth Court had affirmed the Order of Judge Gardner. Nor did Judge McGinley allege in her Opinion that Judge Gardner's ruling was clearly erroneous. She proffered as her only reasoning that a trial judge has the discretion to determine what evidence is admissible at trial. The actual issue, the highest and best use of the property, was the same in both instances, and the highest and best use of property for purposes of ascertaining a taking is the same as the highest and best use for purposes of setting the fair market value. The parties were the same and all parties had a full and fair opportunity to litigate that issue before Judge Gardner. The decision of Judge Gardner became the law of

the case, that determination was affirmed by an appellate court, and Judge McGinley erroneously determined that the Airport Authority could redepose the same experts who testified for WBF during this initial phase of the proceedings as to the highest and best use of the property.

## CONCLUSION

Property owners are affected by public announcements of proposed projects, highway routes, and other public purpose needs. Unfortunately, years may elapse between the date of the announcement and the project's consummation. Even the final plan may differ substantially from that originally disclosed as public opinion (and opposition) is tested. However, consideration must be afforded to those whose property is placed in the fish bowl and entrapped in the mire of public and political bickering. Thus, when a public entity, acting in furtherance of a public project, directly and substantially interferes with property rights and, thereby, significantly impairs the value of the property, the result is a taking and compensation must be paid. When public hearings and resultant publicity cause the owner of a commercial property to lose investors to such an extent that there is a threatened loss of the property, that property owner has a right to the appointment of viewers to award it compensation for its property. Concomitantly, the loss of property is the greatest deprivation a landowner can suffer, far exceeding loss of profits or diminution of the meaningful, beneficial use of the property. Although a sum of money equivalent to estimated fair market value does not provide the perfect yardstick with which to measure the worth of a landowner's property, the condemning authority must seek, as nearly as possible, to replace the land that has been earmarked for public use with equivalent public funds. Here, WBF was unable to proceed with its development, remained without a market for its land, but was still required to make its mortgage payments. The private sector was not interested in investment due to the threat of condemnation. The public sector, as represented by the Airport Authority, having thwarted the development plans

of WBF, realized that WBF was a party that could be deferred interminably and dealt with at leisure.

 In summary, once a property owner has been deprived of the "full and normal use" of his or her property, the owner is entitled to delay damages from the date of the taking. In the instant matter, we hold that WBF is entitled to delay damages from the date of filing its Petition for a Board of Viewers, to include all mortgage interest actually incurred until the date of payment of the award. We further hold that the Commonwealth Court erred in affirming the decision of the second trial judge, which held that the Airport Authority was permitted to relitigate the highest and best use in its appeal following the determination of the board of viewers. Accordingly, the Order of the Commonwealth Court is affirmed in part and reversed in part.

Chief Justice CAPPY and Justices CASTILLE and BAER join the opinion.

Former Justice NIGRO did not participate in the decision of this case.

Justice SAYLOR files a concurring and dissenting opinion.

Justice EAKIN files a concurring and dissenting opinion.

### CONCURRING AND DISSENTING OPINION

Justice SAYLOR.

I agree with the majority's legal conclusion in Part I of its opinion that delay compensation should be due in favor of WBF Associates, but I would offer different reasons in support of this decision and believe that the availability of delay damages should be ultimately contingent upon jury findings in the *de novo* appeal; I respectfully differ with majority's holding concerning the allowance of mortgage interest as a separate component of damages above and apart from delay compensation; and I would affirm the Commonwealth Court's holding on the coordinate jurisdiction question. My reasoning follows.

Regarding Part I of the majority opinion and the issue of delay compensation, at the outset, I would treat the issue as narrower than the question considered and resolved by the majority. In the relevant portion of its brief as the appellant in this case, the Airport Authority takes as settled the proposition that there was a constitutionally significant *de facto* taking as of September 30, 1996, the date on which WBF Associates filed its petition for appointment of a board of viewers. Presumably, it does so as the issue was the subject of a prior appeal in which WBF Associates prevailed, *see Lehigh–Northampton Airport Auth. v. WBF Assoc., L.P.*, 728 A.2d 981 (Pa.Cmwlth.1999), and this Court did not accept that appeal for further review. *See In re Lehigh–Northampton Airport Auth.*, 560 Pa. 751, 747 A.2d 372 (1999) (*per curiam*). Thus, the Airport Authority expressly frames the relevant question as whether a condemnee's entitlement to delay compensation under Section 611 of the Eminent Domain Code may start on a date sometime after a *de facto* taking. *See* Brief for Appellant at 4. The framing of the issue in the majority opinion, however, appears to effectively subsume the question presented in the initial appeal, *see* Majority Opinion, 588 Pa. at 254–55, 903 A.2d at 1199 ("The threshold issue before is what constitutes the date of taking for purposes of computing delay damages."), and the majority's analysis on the merits seems to revisit and approve the Commonwealth Court's holding in that regard. *See, e.g.*, Majority Opinion, 588 Pa. at 257–58, 903 A.2d at 1201 ("This is the same scenario presented in *Conroy–Prugh Glass* where we found that a *de facto* taking had occurred and that to hold otherwise would deprive a property owner of her property without due process of law.").

It is my position that the takings issue is a highly significant question in its own right that is not directly before the Court at this juncture in this case. As the majority puts it into play here, I note that the issue of whether and to what extent pre-condemnation activity on the part of the government can arise to a *de facto* taking has been addressed by many other jurisdictions as a discrete category of takings jurisprudence, frequently couched under the rubric of condemnation or plan-

ning blight. *See generally* 4 J. SACKMAN, NICHOLS ON EMINENT DOMAIN § 12B.17[6] (Rev.3d ed.1995); Robert H. Freilich, *Planning Blight: The Anglo–American Experience,* 29 URB. LAW. vii, viii (1997) (defining planning blight as denoting "the effect upon the value of land for which condemnation is threatened, imminent or potential" (footnotes omitted)). Many courts refuse to treat planning blight as a *de facto* taking, but rather, find the phenomenon to be relevant only to the issue of establishing fair and just compensation.

For example, in a seminal decision in this line of cases, *City of Buffalo v. J.W. Clement Co.,* 28 N.Y.2d 241, 321 N.Y.S.2d 345, 269 N.E.2d 895, 903 (1971), the New York Court of Appeals explained:

> [I]t is clear that a De facto taking requires a physical entry by the condemnor, a physical ouster of the owner, a legal interference with the physical use, possession or enjoyment of the property or a legal interference with the owner's power of disposition of the property. On the other hand, "condemnation blight" relates to the impact of certain acts on the value of the subject property. It in no way imports a Taking in the constitutional sense, but merely permits of a more realistic valuation of the property at the time of the De jure proceeding. In such a case, compensation shall be based on the value of the property at the time of the taking, as if it had not been subjected to the debilitating effect of a threatened condemnation.

*City of Buffalo v. J.W. Clement Co.,* 28 N.Y.2d 241, 321 N.Y.S.2d 345, 269 N.E.2d 895, 903 (1971); *cf. Danforth v. United States,* 308 U.S. 271, 285, 60 S.Ct. 231, 236, 84 L.Ed. 240 (1939) ("A reduction or increase in the value of property may occur by reason of legislation for or the beginning or completion of a project. Such changes in value are incidents of ownership. They cannot be considered as a 'taking' in the constitutional sense[.]").[1] A central concern of these courts is

1. *See also National By–Products, Inc. v. City of Little Rock,* 323 Ark. 619, 916 S.W.2d 745, 748–49 (1996) ("Our holding ... is consistent with the law in several jurisdictions which adhere to the general rule that mere plotting or planning in anticipation of an improvement does

that governmental planning should not be unduly restrained by a concern that it will implicate a premature and unduly burdensome accrual of damages.[2] A number of jurisdictions will recognize a *de facto* taking in some instances involving planning blight, but only when there is direct and substantial interference with existing property rights caused by extraordinary delay or unreasonable or oppressive conduct on the part of condemning party.[3]

not constitute a taking or damaging of the property affected where the government has not imposed a restraint on the use of the property."); *Westgate Ltd.*, 843 S.W.2d at 452–53; *Lone Star Ind. v. Sec. of Kan. Dep't of Transp.*, 234 Kan. 121, 671 P.2d 511, 518–19 (1983); *State ex rel. Washington University Med. Center Redevelopment Corp. v. Gaertner*, 626 S.W.2d 373, 376 (Mo.1982); *DUWA, Inc. v. City of Tempe*, 203 Ariz. 181, 52 P.3d 213, 217 (App.2003) (characterizing New York's *City of Buffalo* approach as the prevailing one); *State ex rel. Mo. Highway & Transp. Comm'n v. Edelen*, 872 S.W.2d 551, 558 (Mo.App.1994) ("The threat of condemnation is neither a taking nor an element of damages in a condemnation suit."). *See generally* 29A C.J.S. EMINENT DOMAIN § 88 (2005) ("A taking will not be found based on the mere diminution or reduction in value of property, even if it is severe, or on the basis that the highest or best use of property is frustrated or denied, or on the basis that some particular right or interest in a parcel of land is burdened, or because the owner is unable to develop the property to its maximum economic potential, or to exploit a property interest that was believed to be available for development."); J.R. Kemper, Annotation, *Plotting or Planning in Anticipation of Improvement as Taking or Damage of Property Affected*, 37 A.L.R.3d 127 (1971 & Supp.).

2. *See, e.g., City of Buffalo*, 321 N.Y.S.2d 345, 269 N.E.2d at 904 ("To hold the date of the announcement of the impending condemnation, whether directly to the condemnee or by the news media, constitutes a De facto taking at that time, would be to impose an 'oppressive' and 'unwarranted' burden upon the condemning authority."); *Westgate Ltd. v. State*, 843 S.W.2d 448, 453 (Tex.1992) ("Construction of public-works projects would be severely impeded if the government could incur inverse-condemnation liability merely by announcing plans to condemn property in the future.").

3. *See, e.g., Barsky v. City of Wilmington*, 578 F.Supp. 170, 173 (D.Del. 1984); *State ex rel. Dep't of Transp. v. Barsy*, 113 Nev. 712, 941 P.2d 971, 976 (1997) ("extraordinary delay or oppressive conduct") (citing *Klopping v. City of Whittier*, 8 Cal.3d 39, 104 Cal.Rptr. 1, 500 P.2d 1345, 1355 (1972)), *overruled on other grounds GES, Inc. v. Corbitt*, 117 Nev. 265, 21 P.3d 11 (2001); *Littman v. Gimello*, 115 N.J. 154, 557 A.2d 314, 319 (1989) (indicating that "[t]he cases are legion that hold that decreases in the value of property during governmental deliberations, absent extraordinary delay, are incidents of ownership and to not constitute a taking," and explaining that "[s]trong policy considerations underpin our holding that lost economic opportunities, forgone financ-

In its decision resolving the first appeal, the Commonwealth Court aptly summarized seminal Pennsylvania cases touching on the subject. *See Lehigh–Northampton Airport,* 728 A.2d at 985–89. Significantly, however, none of this Court's relevant decisions have directly addressed the impact of a contemplated condemnation on prospective land development or have implemented a particular construct which would dictate the outcome of such cases.[4] In this regard, I respectfully disagree with the majority's position that cases such as *Conroy–Prugh Glass Co. v. PennDOT,* 456 Pa. 384, 321 A.2d 598 (1974), are directly on point. *Conroy–Prugh* involved interference with an already established use of the property involved to support existing leasehold interests, *see id.* at 392–93 & n. 2, 321 A.2d at 601–02 & n. *. In contrast, in the present case it is undisputed that the subject property's existing uses remained unrestrained, and it was a prospective use (which was dependent upon successful negotiation of many uncertain contingencies) that was affected by publicity associated with future condemnation. Further, I can find no support in the cases for the majority's apparent reasoning in reconciling the present case with the line of cases represented by *Conroy–Prugh* that,

ing, and diminution in market value arising from government plans and their attendant publicity do not alone give rise to a compensable taking."). *See generally* Gideon Kanner, SH025 ALI–ABA 327 (2002) (presenting the issue of *de facto* taking on account of planning blight under the unreasonable/oppressive government conduct paradigm).

4. The majority suggests that *Petition of Lakewood Memorial Gardens, Inc.,* 381 Pa. 46, 112 A.2d 135 (1955), stands for the proposition that the date of taking in these cases is the date that a governmental entity makes known its intent to appropriate property. *See* Majority Opinion, 588 Pa. at 258 n. 6, 903 A.2d at 1201 n. 6. However, that decision is distinguishable, as it concerned an unusual circumstance in which the government sought acceleration of the date of taking on account of the condemnee's unreasonable activities in inflating damages after a state agency had adopted a resolution of condemnation. *See id.* at 58–59, 112 A.2d at 141. The case was also fairly fact specific, as it involved the Court's extension of a legal principle derived from the State Highway Law to the Turnpike Commission, based on the equities involved. *See id.* at 53–54, 58–59, 112 A.2d at 139, 141. Moreover, as the majority acknowledges, there is considerable room for interpretation among this Court's decisions regarding the general question of whether, and under what circumstances, a *de facto* condemnation will have occurred.

for purposes of takings jurisprudence, the existing or present use of a property should be viewed in terms of its status as the subject matter of a planned, prospective use. *See* Majority Opinion, 588 Pa. at 255–58, 903 A.2d at 1200–1201. To the contrary, present or existing use is generally evaluated in terms of actual use exclusive of prospective application, *see, e.g., Pittsburgh North, Inc. v. PennDOT,* 514 Pa. 316, 320, 523 A.2d 755, 757 (1987) (distinguishing present from prospective use in the setting of delay compensation); whereas, it is the beneficial (including highest and best) use criterion that takes potential uses into account. *See, e.g., Genter v. Blair County Convention and Sports Facilities Auth.,* 805 A.2d 51, 57 (Pa.Cmwlth.2002) ("The beneficial use of a property includes not only its present use, but also all potential uses including its highest and best use.").

I also find it significant that acceleration of the time of taking to account for pre-condemnation activity is in tension with the statutory eminent domain scheme, which expressly attempts to account for the effect of pre-condemnation activity by removing it from the fair market value determination, akin to the approach of the New York Court of Appeals in the *City of Buffalo* case. *See* 26 P.S. § 1–604 ("Effect of imminence of condemnation").[5] In light of all of the above considerations, I believe that resolution by this Court of the foundational issue of whether a taking occurred by virtue of the Airport Authority's announcement of its intention to appropriate the subject property and/or surrounding properties at some future time is a distinct matter of first impression that would merit this Court's focused consideration in a case in which the question has been squarely accepted for review and fully briefed.[6]

**5.** The statute prescribes:

Any change in the fair market value prior to the date of condemnation which the condemnor or condemnee establishes was substantially due to the general knowledge of the imminence of condemnation, other than that due to physical deterioration of the property within the reasonable control of the condemnee, shall be disregarded in determining fair market value.

26 P.S. § 1–604.

**6.** I tend toward the view that pre-condemnation activity may yield a constitutionally significant taking where the government engages in

Putting the taking issue aside in accordance with the Airport Authority's framing of the question presented, I believe that resolution of the delay compensation issue is relatively straightforward. Section 611 of the Eminent Domain Code disallows the payment of delay compensation during the period that the condemnee remains in possession unless "the condemnation is such that possession is not required to effectuate it[.]" 26 P.S. § 1–611. Where possession is not required to effectuate a condemnation, however, under the plain terms of the statute "delay compensation shall be paid from the date of condemnation." *Id.* The Airport Authority's present argument is that the statutory concept of possession is different from the taking determination and centers on the "full and normal use" as opposed to "highest and best use." This argument, however, fails to take into account the requirement deriving from federal constitutional doctrine that delay compensation must be paid from the time of a taking.[7] Since we are to presume that the Legislature intended to conform its enactments to constitutional requirements, *see* 1 Pa.C.S.

unreasonable delay and/or oppressive conduct. Further, I note that the Airport Authority's conduct in failing to commence *de jure* condemnation proceedings for at least two years following the announcement of its expansion plans may perhaps suffice to satisfy such criteria. Again, however, I recognize that the Airport Authority has not had the opportunity to brief such issue in this Court because its petition for allowance of appeal challenging the Commonwealth Court's first order was denied. Therefore, I offer no definitive opinion on this point, and I respectfully disassociate myself from the majority's various expressions in this regard.

7. The United States Supreme Court has explained that, when payment of fair market value is deferred for a period following a taking, "something more than fair market value is required to make the property owner whole, to afford him 'just compensation.' " *Albrecht v. United States,* 329 U.S. 599, 602, 67 S.Ct. 606, 608, 91 L.Ed. 532 (1947); *see also United States v. Klamath and Moadoc Tribes,* 304 U.S. 119, 123, 58 S.Ct. 799, 801, 82 L.Ed. 1219 (1938) (describing just compensation as "value at the time of the taking plus an amount sufficient to product the full equivalent of that value paid contemporaneously with the taking.") (citing *Jacobs v. United States,* 290 U.S. 13, 16, 54 S.Ct. 26, 27, 78 L.Ed. 142 (1933)). The Takings Clause of the Fifth Amendment of the United States Constitution applies to the states through the Fourteenth Amendment. *See Phillips v. Wash. Legal Found.,* 524 U.S. 156, 163–64, 118 S.Ct. 1925, 1930, 141 L.Ed.2d 174 (1998).

§ 1922(3); because the Pennsylvania General Assembly could not limit the availability of delay compensation in the event of a constitutionally significant taking by keying the availability of delay damages to some different conception; and as it is uncontested for purposes of this issue that a taking occurred at least as of September 30, 1996, I agree with the majority that delay compensation is due as of that date relative to damages found by the jury in the *de novo* appeal.[8]

As to Part II of the majority opinion, I respectfully disagree with the majority's determination that Section 609 of the Eminent Domain Code applies to mortgage interest. *See* Majority Opinion, 588 Pa. at 260–62, 903 A.2d at 1203. Section 609 provides that:

> Where proceedings are instituted by a condemnee under section 502(e), a judgment awarding compensation to the condemnee for the taking of property shall include reimbursement of reasonable appraisal, attorney and ·engineering fees and other costs and expenses actually incurred.

26 P.S. § 1–609. For several reasons, I read the statute as addressed to litigation expenses which are specially incurred by a condemnee who is forced to invoke the judicial process, and not to distinct holding and/or carrying costs associated with property ownership. First, under the principle of *ejusdem generis*, general words in a statute are construed to take

---

**8.** Contrary to the Airport Authority's arguments, I do not read the decision in *Hughes v. PennDOT*, 514 Pa. 300, 523 A.2d 747 (1987), as militating to the contrary. While *Hughes* clearly recognized that infringement on full and normal use implicates delay compensation, *see id.* at 309–10, 523 A.2d at 752, this holding was not framed as an exclusive one. Although the reasoning applied in *Pittsburgh North* does tend to support the Airport Authority's position, the case is distinguishable, because it involved a *de jure* condemnation, where there was no uncontested finding of a prior *de facto* condemnation, as there is here. *See Pittsburgh North*, 514 Pa. at 320, 523 A.2d at 757.

Again, I would emphasize, however, that the above analysis as applied to the circumstances of this case assumes that the Airport Authority's activities in contemplation of a *de jure* condemnation thwarted the highest and best use of the subject property as a planned residential development and amounted to a constitutionally significant taking, since these matters as established by the Commonwealth Court's first opinion in this case are not challenged by the Airport Authority in connection with its presentation of the issue in question.

their meaning and be restricted by preceding, particular words. *See Independent Oil and Gas Ass'n of Pa. v. Board of Assessment Apps. of Fayette County*, 572 Pa. 240, 246, 814 A.2d 180, 183–84 (2002) (citing 1 Pa.C.S. § 1903(b)). In this regard, it seems to me that holding and/or carrying costs such as mortgage interest are substantially different in character from the litigation-related costs (appraisal, attorney, and engineering fees) that are specified in Section 609.[9] *Cf. 66, Inc. v. Crestwood Commons Redevelopment Corp.*, 130 S.W.3d 573, 589 (Mo.App.2003) ("No court has ever held that mortgage interest, much less interest on a loan to secure cash to lend to others, falls within the category of attorney's fees, costs, or other reasonable expenses and losses.").[10] Furthermore, the General Assembly separately provided for delay compensation in Section 611 of the Code, 26 P.S. § 1–611, which I believe substantially overlaps with holding and/or carrying costs.[11] Thus, in my view, the majority's approach creates the substantial risk of a double recovery. *Accord 66, Inc.*, 130 S.W.3d at 589–90 ("To allow plaintiff to recover interest on loans securing the property, in addition to statutory interest, would result in a duplicative recovery for one loss, the practical deprivation of its ability to sell the property.").[12]

9. Parenthetically, the comment of the Joint State Government Commission from a 1971 report as reprinted in Purdon's Pennsylvania Statutes and Consolidated Statutes Annotated reflects that Section 609 captures the costs and expenses identified by Section 304 of the Federal Relocation Act, 42 U.S.C. § 4654, which is captioned, "Litigation expenses." *See* 26 P.S. § 1–609, Comment–Joint State Government Commission.

10. I recognize that the Airport Authority does not advance the specific argument that Section 609 does not by its terms pertain to mortgage interest. However, I find its argumentation pointing to the prospect of a double recovery, *see, e.g.*, Brief for Appellant at 43–45 ("It is unfair, absurd, and unjust for WBF to recover both delay compensation and ownership expenses for the same period of time."), sufficient to avoid a waiver.

11. In this regard, while the General Assembly attempted to limit delay compensation to a six percent interest figure, *see* 26 P.S. § 1–611, this Court has found such limitation inconsistent with the concept of just compensation. *See Hughes*, 514 Pa. at 310–12, 523 A.2d at 752–53.

12. I also have substantial difficulty with any bright-line rule that would strictly require the payment of holding and/or carrying costs as such as a component of just compensation, in light of the myriad forms of

In its rejoinder to my position on the Section 609 issue, the majority develops the facts underlying the *66, Inc.* decision and suggests that they are much less appropriate to an award of mortgage interest than are the present circumstances. *See* Majority Opinion, 588 Pa. at 261–62 n. 11, 903 A.2d at 1203–04 n. 11. There are also many other cases in which an award of mortgage interest in the just compensation calculus would be unwarranted.[13] This, in my view, tends to support, rather than negate the understanding that the General Assembly intended a more limited construction of Section 609 than the majority implements. Again, I take no issue with the proposition that some accounting for ownership expenses could be an appropriate and necessary element of just compensation in some *de facto* condemnation cases (either via the delay compensation provision as modified by this Court's interpretation in *Hughes, see supra* note 11, or otherwise). To the extent that the Eminent Domain Code would foreclose such an award in circumstances where it is essential to just compensation, the statutory scheme may have to yield to constitutional dictates, consistent with the Court's reasoning in *Hughes. See supra* note 11. My difference is solely with the majority's decision to categorize mortgage interest costs among the "appraisal, attorney and engineering fees and other costs and expenses" that are required to be awarded under Section 609, contrary to the Legislature's prescription that "[g]eneral words [in a statute] shall be construed to take their meanings and be restricted by preceding particular words," 1 Pa.C.S. § 1903(b).

Finally, I believe that the effect of the Airport Authority's payment of estimated just compensation upon its obligation to

financial arrangements entered into between parties in the commercial marketplace, including non-market-rate insider mortgages.

**13.** For example, in *Department of Conservation v. Lawless*, 100 Ill. App.3d 74, 55 Ill.Dec. 399, 426 N.E.2d 545 (1981), the reviewing court found a claim by a homeowner for mortgage interest from the time of a taking as an element of just compensation to be "completely meritless." *Id.* at 550. The court explained:

Does Mr. Lawless expect to live on the condemned premises for a two year period for nothing? Such is the result, if we accept the argument he advances. As long as people pay for housing, either by mortgage or rental payments, Mr. Lawless can expect to do no less. *Id.* at 550.

pay delay compensation must be resolved after the final determination of just compensation, because, until then, it is unknown whether, or to what degree, the initial estimation was accurate.

On the last point resolved in Part III of the majority opinion concerning the effect of the *de facto* taking determination in the context of the *de novo* appeal, I agree with the majority that the assessment of highest and best use made in the taking context presents a factual question, or at least, a mixed question of law and fact. *See generally* 27 AM.JUR.2D EMINENT DOMAIN § 548 (2005) ("The question of the highest and best use of a property is a question of fact.").[14] This Court has established that factual matters in eminent domain proceedings are subject to *de novo* consideration by a jury in a statutory appeal. *See In re Condemnation by Pa. Turnpike Comm'n*, 548 Pa. 433, 439, 698 A.2d 39, 42 (1997).[15] Therefore, I am in agreement with the Commonwealth Court that the jury should not be constrained on the highest-and-best-use point, albeit that I realize that a finding unfavorable to WBF Associates could undermine the trial court's initial holding that there was a *de facto* taking, since it was grounded on the fact-based assessment of such beneficial use. My difference with the majority arises because I do not regard this possibility as a concern of the law of the case doctrine and/or the interrelated coordinate jurisdiction principle. Rather, and again, I believe that it is merely corollary to the *de novo* character of the jury proceedings in the eminent domain context.

14. Nevertheless, I recognize that the matter was properly before the common pleas court in the first instance on the Airport Authority's initial preliminary objections to the petition for an appointment of viewers, under the unique preliminary objections procedure pertaining in eminent domain proceedings. *See* 26 P.S. § 1–504 (authorizing the common pleas court to resolve factual disputes on preliminary objections in eminent domain proceedings).

15. A plain-meaning interpretation of the governing statute, 26 P.S. § 1–517, suggests that the line of division between matters to be decided by the judge and those to be decided by the jury should be defined according to whether the matter pertains solely to valuation; however, this Court has endorsed the Commonwealth Court's rejection of such division in favor of the legal/factual distinction. *See In re Condemnation by Pa. Turnpike Comm'n*, 548 Pa. at 439, 698 A.2d at 42.

## CONCURRING AND DISSENTING OPINION

Justice EAKIN.

I join the majority's opinion on issues I and III. I dissent from the award of mortgage interest, and join with the reasoning of Justice Saylor on that point.

Under § 502(e) of the Eminent Domain Code, "a judgment awarding compensation to the condemnee for the taking of property shall include reimbursement of reasonable appraisal, attorney and engineering fees and other costs and expenses actually incurred." 26 P.S. § 1–609. Mortgage interest is not "other costs and expenses actually incurred" because interest on the mortgage would have accrued regardless of the condemnation.

Mortgage interest is based on a debt secured by the property—taking of the property affects only that security, not the debt itself nor its terms and conditions. *See Briegel v. Briegel*, 307 Pa. 93, 160 A. 581, 583 (1931) (upon condemnation, liens, encumbrances, or mortgages are divested from land and attach to funds realized from land). Mortgage expenses are not created by or connected to the condemnation of that property; in fact, the initial proceeds of a mortgage may or may not relate to the encumbered property itself—proceeds may be used for any purpose at all, not just the acquisition or improvement of the property encumbered. The obligation to repay the mortgage is required only because of the terms of the mortgage itself, not by reason of the condemnation. *See id.* While the ability to repay mortgage interest may be affected by the taking, that does not convert mortgage interest itself into part of the "costs and expenses" caused by the condemnation.